COMMONWEALTH vs. VICTOR E. DELRIO.

Essex.    April 14, 1986. — September 30, 1986.

Present: GRANT, KAPLAN, & PERRETTA, JJ.

*Practice, Criminal,* Admissions and confessions, Voir dire, Instructions to jury, Argument by prosecutor. *Identification. Constitutional Law,* Admissions and confessions. *Evidence,* Other offense, Cross-examination, Impeachment of credibility. *Error,* Harmless.

At the trial of a narcotics case during which a police officer testified that, while police officers were conducting a search of an apartment for drugs, the defendant, who had not received Miranda warnings, made an admission in Spanish which was translated by a person present in the apartment, there was reversible error in the denial of the defendant's motion for a voir dire to resolve conflicting testimony as to whether the admission had been volunteered by the defendant or had been made in response to a question by police. [717-718]

Allowance by one judge of a defendant's motion to sever two indictments charging sale of heroin from an indictment charging possession of heroin with intent to distribute did not require a second judge, at the trial of the indictment for possession with intent to distribute, to exclude evidence of the two drug sales, where this evidence was relevant on the question of the defendant's intent to distribute. [718-719]

At the trial of an indictment charging possession of heroin with intent to distribute, at which an undercover police officer testified that during two brief encounters prior to the events in question he had bought heroin from the defendant, the judge erred in refusing to charge the jury, as requested by the defendant, on the possibility of a good faith mistake by the police officer in identifying the defendant as the seller. [719-721]

At the trial of an indictment for possession of heroin with intent to distribute, the judge erred in permitting the prosecutor, while cross-examining the defendant, to ask repeated insinuating questions concerning an incident during which heroin was found in an automobile in which the defendant was a passenger, where the defendant made objections to this questioning and claimed a mistrial, where the prosecutor was not compelled to make any representation of having independent proof of this incident or required to produce such proof, and where in unrelated proceedings the heroin found in the automobile had been suppressed as illegally seized. [721-722]

INDICTMENT found and returned in the Superior Court Department on January 25, 1984.

The case was tried before *John L. Murphy, Jr.,* J.

*Jane Larmon White,* Committee for Public Counsel Services, for the defendant.

*Elin H. Graydon,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. We are obliged to reverse the conviction of the defendant, Delrio (the case to stand for a new trial), by reason of errors in the denial of the defendant's motion for voir dire regarding an alleged admission by him, the failure to instruct adequately on an issue of identification of the defendant, and the improper handling of a previous incident in which evidence was suppressed as illegally seized. In the course of outlining the substance of the trial, we indicate how these problems arose; then we elaborate upon each.

*The Trial.* The defendant was indicted and tried for the knowing possession of a class A substance, heroin, with intent to distribute the same (G. L. c. 94C, § 32), also for the unlawful possession without license of a dangerous weapon, a handgun. An Essex County jury found him guilty of the former crime but not guilty of the latter, and the defendant takes his appeal from the judgment of conviction. One Luis Rivera was tried together with the defendant on the like drug charge. The trial judge allowed Rivera's motion for a required finding of not guilty at the close of the Commonwealth's case.

The Commonwealth's case against Delrio ran thus. On January 12, 1984, about 3:30 P.M., a seven-person team of Lynn police officers and State troopers, possessing a search warrant, broke into the third-floor apartment of 76 Hanover Street, Lynn, rented to Isidro and Domingo Coporan. Pushing through a door, covered with a cloth, opening on the front bedroom, officers surprised the Coporans in that room in full swing of using characteristic paraphernalia to cut and bag heroin;[1] the heroin on hand in the room had a street value of $30,000. The

---

[1] The items found included two spiral notebooks of account in which the name "Victor" twice appeared.

Coporans were brought into the kitchen.[2] A minute earlier Luis Rivera had been found in the rear bedroom and he, too, was brought into the kitchen. Officer Raymond D. Richard entered the rear bedroom thinking it had been secured, but on peering into a closet there he saw "two eyes looking at me" — this was the defendant hiding. The defendant joined the others in the kitchen.

Officer Richard examined a blue suitbag hung inside the closet door. It contained, besides trousers, six bundles (ten bags each) and some loose packets of heroin (total value $1,430); also a loaded semiautomatic handgun. Richard passed the suitbag with contents to Sergeant John LeBrasseur, who took it to the kitchen. LeBrasseur testified that the defendant said something to him in Spanish, which he did not understand; that he asked Rivera in English what the defendant was saying; that Rivera replied in English that the defendant wanted to know what LeBrasseur was doing with his (the defendant's) bag. LeBrasseur said he held up the bag in front of the defendant, and the defendant said, "Me, me." (Bearing on point 1 below: defendant's counsel had applied before trial, and applied again during LeBrasseur's testimony, for a voir dire about the circumstances of this alleged admission which came, be it noted, before the defendant, now in police custody, was given Miranda warnings. The applications were denied.)

At the foot of the bed in the back bedroom was a brown leather bag. One side pocket held foil packets of heroin (worth $10,000), the defendant's passport (in the name of Victor Emilo Delrio), and a wallet with a Venezuelan identification card carrying the defendant's name and photograph.[3]

To bolster any direct evidence that the defendant knowingly possessed with intent to distribute some quantity of heroin at 76 Hanover on January 12, 1984, the Commonwealth called

---

[2] The Coporans were indicted, but after posting bail fled the country.

[3] It appeared that the defendant, thirty-six years old, was born and lived in the Dominican Republic, then lived in Venezuela, and came to the United States in 1981. He lived in Miami, was in Atlantic City for a while, and came to Lynn in 1983. He said he was a professional boxer but apparently had had no fights since coming to Lynn.

Trooper John J. Walsh (not a participant in the raid on January 12) who testified that on January 11, and again on January 12, he made "buys" of heroin in the street from a person whom he identified as the defendant. (Point 2[a]: defendant failed in his attempt to have these alleged sales excluded as too remote from the offenses in suit.) On January 11, according to Walsh, around 3:00 P.M., he and Trooper Paul J. Regan (also unconnected with the raid), in civilian clothes, were in an unmarked cruiser near 138 Franklin Street, three blocks from 76 Hanover. Leaving the car, Walsh approached a man ("Victor") and asked him whether he had any "down" (heroin). The man answered in broken English that he had a bundle for $140. The sale was carried out in the doorway of 138 Franklin. On January 12, at 1:15 P.M., Walsh approached Victor opposite 138 Franklin, and a similar sale, of a bundle for $140, was carried out, this time with the seller dealing from the driver's seat of a car parked nearby. Each incident, from sighting the seller to sale, took only a half minute or so (facts emphasized in Walsh's cross-examination). A few days after January 12, Walsh was shown a picture of Delrio taken after his arrest at the raid. He took the picture to be that of Victor, and at trial identified Delrio as the Victor from whom he had made the buys.[4]

On its part, the defense called the defendant's girlfriend, Robin Downs. She tendered an alibi for the event of January 11. On that day, she said, she drove with the defendant to her mother's place in Center Ossipee, New Hampshire, and returned with him to Lynn in the evening. She and the defendant spent the night at a motel in Lynn.[5]

The defendant, picking up the story with his departure from the motel at 6:00 A.M. the following morning, testified (through

---

[4] Walsh's testimony was preceded during a halt in the trial by a voir dire about the claimed suggestiveness of photographic identifications. Defendant's counsel called and interrogated Troopers Walsh and Regan. The judge declined to bar Walsh's testimony and this is not attacked as error.

[5] On cross-examination, Downs testified to the effect that she knew the Coporans were drug dealers. The defendant told her he knew the Coporans, but he denied working for them. The defendant had money but she did not know how he supported himself.

an interpreter) that, after idling through the morning and early afternoon, he entered the Coporans' apartment a few minutes before the raid. He had come to fetch his bag which contained boxing gear (see note 3) and his passport and Venezuelan identification. Just before taking off with Downs for New Hampshire, he said, he had entrusted the bag with contents to Isidro (whom he had encountered in a car on the street), intending to pick it up later. Thinking the intruders (officers out of uniform) in the Coporans' apartment were thieves, he hid himself in the closet. He denied owning the suitbag (or the gun). He had no connection with the brown or black bag. The officer had taken his wallet from his person. He knew no English. He had not said anything about the suitbag while in the kitchen; Rivera said nothing to him and he said nothing to Rivera or to Sergeant LeBrasseur. He knew the Coporans more or less casually from Santo Domingo and Venezuela. He never sold drugs for the Coporans and did not know what a "runner" was. He did not sell drugs on January 11 or 12.

Evidently attempting to attack the defendant's testimony that he knew the Coporans casually without criminal involvement,[6] the Commonwealth on cross-examination of the defendant proceeded to question him about an incident in North Andover on November 22, 1983, at 1:30 A.M. Isidro was driving with the defendant as passenger. Police stopped the car for a traffic violation but, allegedly finding heroin in the car, and seizing it, arrested Isidro and the defendant on charges of knowing possession with intent to distribute. The charge against the defendant was later nol prossed when a judge of the Superior Court held the seizure to be illegal.[7] Cross-examining the defendant, the prosecutor repeatedly put it to the defendant that he knew there was heroin in the car; indeed, that the heroin was between his legs. The defendant denied any such knowledge or even an understanding of why he had been arrested; he

---

[6] The prosecutor drew from the defendant that he was at the Coporans' on December 24, 1983.

[7] The nature of the North Andover charge and disposition is made known by ad⌐ ,nda to the record. It does not appear so clearly in the cross-examinatioi  In fact the judge in that case held against the Commonwealth's claim that the material seized was in "plain view."

said he had accepted Isidro's invitation to go out and see Lawrence. (Point 3: defendant's counsel objected to the whole line of questioning and finally moved for a mistrial, all without relief.)

The trial closed on that note. We shall have occasion to refer to the prosecutor's closing argument.[8] Defendant's counsel had seasonably requested that the judge give an instruction on the lines of the standard instruction set out in *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 301-302, 310-311 (1979), with respect to the identification of the defendant by Trooper Walsh as the person from whom he had twice bought heroin. The request was denied (see point 2[b]).

*Errors Claimed. 1. Denial of voir dire regarding defendant's alleged statement.* The police report made available to the defense said nothing about any statement by the defendant, but LeBrasseur testified before the grand jury that the defendant (without benefit of Miranda warnings, as we have said) asked him what the police were doing with his bag, the defendant's question being translated by Rivera at LeBrasseur's request. At the argument on the defendant's motion before trial for voir dire about this supposed admission,[9] counsel for Rivera said Rivera's version, as communicated to counsel, was different from LeBrasseur's: according to Rivera, the police asked him (Rivera) to ask the defendant "what the bag was all about," and he did so. On LeBrasseur's version, the defendant's statement would have been made spontaneously and would be admissible although made before Miranda warnings. See *Commonwealth* v. *O'Brien,* 377 Mass. 772, 776 (1979); *Commonwealth* v. *Trigones,* 397 Mass. 633, 643 (1986). According to Rivera, the questioning would have been initiated by the police, using Rivera as an interpreter; thus the answer would be inadmissible, just as it would be if made in response to a direct question by the police without a neutral intermediary. See *Commonwealth* v. *Mahnke,* 368 Mass. 662, 677 (1975), cert.

---

[8] At points 2(b) and 3.

[9] As indicated, the motion was repeated at an interval in LeBrasseur's testimony at trial.

denied, 425 U.S. 959 (1976). Whether one or the other version was the true one should have been examined on voir dire; the right in these circumstances to such threshold judicial determination is clear. See *Jackson* v. *Denno,* 378 U.S. 368, 380-383 (1964). In the background, and also worthy of inquiry if voir dire had been allowed, was the possibility that Rivera was not an indifferent interpreter, that to free himself of any suspicion that he was himself the owner of the suitbag, he had sedulously mistranslated or otherwise distorted any statement that the defendant made.

The trial judge was not responsive to the defendant's argument about voir dire. He said merely that the question was one of credibility. Yes, that was involved, and it should have been resolved at voir dire. There was error.

2. *Treatment of sales of January 11 and 12 — identification of the seller.* (a) *Question of remoteness.* Indictments were returned against the defendant for the alleged street sales. These were in addition to the instant indictments. The Commonwealth originally moved for joint trial of all these indictments; the defendant moved for relief from prejudicial joinder. The motion judge (not the trial judge) disallowed the joinder without, however, explaining why he had done so. By motion in limine, the defendant urged the trial judge to exclude evidence about the sales as any part of the Commonwealth's case on the indictments about to be tried. The ground (amplified in the defendant's brief on this appeal) was that the negative decision on joinder involved an implicit determination that there was a lack of substantial connection or relation between the alleged sales and the offenses awaiting trial, and that the judge must, or at any rate should, respect that determination in trying this case. Thus he ought to hold that the sales, being remote, could not be brought forward as "bad acts" bearing on any feature of the case. The motion to exclude was denied in limine and again at trial.

On the present appeal the question is renewed. We need not deal with the defendant's argument in detail. It founders on the consideration that the criteria for trial joinder are not shown

to be identical with those for admission of "bad acts."[10] We add that the trial judge was not bound by any rule of former adjudication to follow the earlier determination even if it had been explicit and in point rather than vaguely inferential and highly conjectural. See *Salter* v. *Scott*, 363 Mass. 396, 401-402 (1973).

Apart from claimed emanations from the negative decision on trial joinder, the defendant appears to acknowledge in his brief that the trial judge had discretion — weighing probative value against prejudice in the usual way — to admit evidence of these sales which occurred shortly before the raid on 76 Hanover (defendant cites *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695 [1979]). If brought home to the defendant, the evidence could have a bearing on the question of intent to distribute, an ingredient of the drug crime.[11] Admission of the evidence on such a basis in the present case comported, we think, with the views of both the majority and the dissenting Justice on bad acts evidence in the recent case of *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-229 & 234-239 (1986). The trial judge went on to instruct the jury properly on the function or reach of such evidence.

(b) *Rodriguez charge*. Thus there was no error in admitting Trooper Walsh's testimony about the two buys, and there was no dispute that he had made them; but there was dispute about the identity of the seller. Walsh was positive in his testimony, but as a member of a special drug task force he was engaged in many transactions at the time, and the opportunities for

---

[10] The prosecutor evidently mentioned to the judge handling the joinder motion that in case joinder was denied he would still introduce evidence of the sales in the trial of the present indictments (for the conventional limited purposes for which they can be offered).

[11] The formulaic statement is that prior bad acts may come in under proper conditions "to show a common scheme, pattern of operation, absence of accident or mistake, identity, *intent*, or motive" (emphasis added). *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986), and cases cited. There are many instances where evidence of prior drug transactions has been admitted to prove intent, motive, etc. with respect to particular drug offenses on trial. See, e.g., *United States* v. *Gonzalez*, 661 F.2d 488, 494 (5th Cir. 1981); *United States* v. *Koessel*, 706 F.2d 271, 275 (8th Cir. 1983). Cf. *Campbell* v. *United States*, 538 F.2d 692, 693 (5th Cir. 1976).

observation in the particular sales were brief. Misidentification was thus possible, and a *Rodriguez*-type charge, see 378 Mass. at 310-311, was requested accordingly. This was denied, and the judge's instructions to the jury relevant to the sales consisted of a statement that the Commonwealth had the burden to show that this defendant was the seller, plus general statements of the usual type about credibility. Lacking was the heart of the *Rodriguez* charge, a forceful warning that misidentification need not occur through venality, it may come about through innocent human mistake (occasioned by any of a number of factors). We may note that a proper *Rodriguez* charge was especially called for because the prosecutor, during his closing argument to the jury, had gone to an extreme in attempting to support Walsh's testimony. The prosecutor said: "I suggest to you that you saw a very professional person testify, Officer Walsh, who had prior dealings with this man. Do you think he was mistaken about who he dealt with on the street? Totally absurd." The defendant claimed a mistrial: first, by the vehemence of the quoted remark — "Totally absurd" — the prosecutor appeared to be vouching personally for Walsh's credibility; second, the reference to "prior dealings with this man" implied criminal involvements of the defendant before January 11-12 known to Walsh but left mysteriously undefined. We think the prosecutor's statement was at least very unfortunate, highlighting the need for *Rodriguez* prophylaxis.

The judge explained his refusal to respond to *Rodriguez* by saying that identification was not an issue. By this he must have meant there was no dispute that it was the defendant who was apprehended during the raid. The judge missed the point that identification was in issue on the significant question of the sales. We think the policy of *Rodriguez* carried over. The substance of the standard instruction should have been given in relation to the sales. This charge would be kept in proper proportion to the whole case by being connected with the judge's remarks on the purpose for which evidence of the sales was admitted. To quote (with adaptions to our case) from *Commonwealth v. Pressley*, 390 Mass. 617, 620 (1983): "Fairness to a defendant compels the trial judge to give an instruction

on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it. . . . The failure to give this instruction at this defendant's trial was particularly prejudicial because the jury might very well have declined to conclude that [Trooper Walsh] had lied, but may have been more inclined to believe that [he] was honestly mistaken." The judge erred.

3. *Handling of the incident of November 22.* The Commonwealth sought to introduce this November incident through the medium of cross-examining the defendant. When the prosecution — departing at one point in the cross-examination from that episode — asked the defendant whether he had not come out of the Coporans' apartment, with heroin to sell, on three dates in January preceding the two supposed sales and the raid, the judge, upon objection, asked the prosecutor whether he would represent that "you will present such evidence." As the prosecutor answered no, the judge disallowed questioning the defendant on the subject. The ruling was correct. Where an examiner on cross-examination suggests new facts in an effort to impeach a witness, the examiner should be required to represent that he has a reasonable basis for the suggestion, and also to be prepared with proof if the witness does not acquiesce in the suggestion by giving a self-impeaching answer. Without such assurances, the questioning of the witness is improper, for it would amount to allowing the examiner to smear the witness by insinuation, and unfairly to cast on the other side (here the defendant-witness) a burden somehow to fend against it. See, e.g., Burger, J., concurring in *Jackson* v. *United States*, 297 F.2d 195, 198 (D. C. Cir. 1961); *Lee Won Sing* v. *United States*, 215 F.2d 680 (D. C. Cir. 1954); *Pinkney* v. *United States*, 363 F.2d 696, 698 n. 4 (D. C. Cir. 1966). See also *Reichert* v. *United States*, 359 F.2d 278, 281-282 (D. C. Cir. 1966).

Curiously, having dealt properly with the prosecutor's attempted interrogation about the supposed early January sorties, the judge, over objections and a claim of mistrial,[12] allowed the

[12] The sense of the defendant's objections was that the attempted impeachment of the defendant was improper (with the implication for

prosecutor, in cross-examining the defendant, to ask repeated, insinuating questions about heroin alleged to have been in the car between the defendant's legs during the incident of November 22: the prosecutor was not compelled to make any representation of having independent proof, nor was he required to, nor did he produce such proof. The defendant did not acquiesce in the prosecutor's insinuation; he simply denied it. In his closing argument to the jury the prosecutor referred to heroin-between-the-legs as if proved.

That the prosecutor's questions on cross-examination related to material that had been suppressed as illegally seized exacerbated the error in allowing such examination. The United States Supreme Court has in some circumstances allowed evidence illegally seized, or admissions obtained in violation of the Miranda rule, to be used for impeachment purposes. See *Walder* v. *United States*, 347 U.S. 62 (1954); *Harris* v. *New York*, 401 U.S. 222 (1971); *United States* v. *Havens*, 446 U.S. 620 (1980). The case of *Harris* v. *New York* was followed here in *Commonwealth* v. *Harris*, 364 Mass. 236, 238-241 (1973). The doctrine, however, is and should be a guarded one, and assumes a fair and proper process of impeachment. It is instructive, as the defendant points out, that it was not by insinuation in cross-examination but by independent, direct proof, that material previously suppressed was offered by way of impeachment in, e.g., *Walder* v. *United States*, 347 U.S. at 64; *Oregon* v. *Hass*, 420 U.S. 714, 717 (1975); *Commonwealth* v. *Harris*, 364 Mass. at 237-238.

There was error.

*Conclusion.* The Commonwealth argues that such errors as may have been committed should be held "harmless" beyond a reasonable doubt. Thus it suggests (as to point 1) that the allowance in evidence of the defendant's supposed admission about the suitbag may have had minor influence on the jury

the doctrine of *Harris* v. *New York*, 401 U.S. 222 [1971], noted in the text below).

The judge apparently declined to stay and hear defendant's counsel put his position on the record, and was unaware that a motion for mistrial was made (he subsequently denied the motion).

because they found him not guilty of the firearm charge. The lack of a suitable instruction about identification (point 2 [b] ), the Commonwealth suggests, might be overlooked in light of the evidence of record that points toward the defendant's guilt of the drug charge. The Commonwealth suggests further (as to point 3) that the impeachment by means of the November 22 incident may have been unimportant because the episode was collateral to the main case; indeed, the defendant might possibly have been helped by the jury's learning that the drug charge against the defendant was nol prossed. However, we are required to set aside the conviction unless we are "sure that the error[s] did not influence the jury, or had but very slight effect . . . ." *Kotteakos* v. *United States*, 328 U.S. 750, 764 (1946). See also *Commonwealth* v. *Royce*, 20 Mass. App. Ct. 221, 228-229 (1985), and cases cited. As disinterested observers, we do not have any such "sureness."

*Judgment reversed.*

*Verdict set aside.*