COMMONWEALTH vs. JOSE N. RUBIO.

No. 88-P-914.

Essex. May 9, 1989. — June 28, 1989.

Present: GREANEY, C.J., DREBEN, & WARNER, JJ.

*Controlled Substances. Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions. *Practice, Criminal,* Instructions to jury. *Words,* "Interrogation."

Although the defendant in a criminal case failed to file a pretrial motion to suppress or for a voir dire challenging the admissibility of an incriminating statement on the ground that it was obtained from him without his being advised of his Miranda rights, his seasonable objection at trial to the admission of the statement in evidence was sufficient to raise (and preserve for appeal) the issue of its admissibility; consequently, the trial judge should have stopped the trial and conducted an appropriate inquiry. [509-511]

A criminal defendant's first admission, procured without Miranda warnings, to ownership of a quantity of cocaine should have been suppressed where the admission, which was made while the defendant was under arrest in an apartment, confined to a kitchen chair, and surrounded by police officers, had followed a police officer's deliberate act of showing the defendant the cocaine; and where the admission constituted a verbal response to a purposeful technique calculated to obtain information that could be used against the defendant. [511-514]

Where the record on appeal of a criminal case did not permit this court to determine the admissibility of the defendant's inculpatory statement made after he received Miranda warnings, but subsequent to an unwarned statement which the trial judge should have suppressed, the judge assigned the retrial of the case was to conduct a voir dire to inquire whether the second statement should be allowed in evidence under the standard set forth in *Oregon* v. *Elstaad,* 470 U.S. 298, 307 (1985). [514-515]

INDICTMENT found and returned in the Superior Court Department on July 29, 1987.

The case was tried before *John L. Murphy, Jr.,* J.

*Murray Kohn* for the defendant.

*David Grossbaum,* Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. A jury in the Superior Court found the defendant guilty of trafficking in cocaine. We conclude that a statement of the defendant, admitted in evidence at the trial over objection, was obtained by the police in violation of the defendant's rights under *Miranda* v. *Arizona,* 384 U.S. 436 (1966). Consequently, there must be a new trial. The admissibility of a second statement will need to be decided at a voir dire preceding retrial.

The Commonwealth presented the following evidence. About 3:40 P.M. on June 26, 1987, six members of a police drug task force, led by Sergeant Paul J. Regan and Lieutenant James Jajuga of the State police, executed a search warrant for the first-floor apartment at 41 Cross Street in Lawrence. The warrant authorized the police to search for cocaine and related drug implements, and it described the apartment's occupant as an "[u]nknown Latino Male 5'6", 165 pounds, approximately 29-31, short hair, medium complexion, medium build." The officers knocked on the door of the apartment and received no response. After hearing noises from inside, they entered. A radio was on and no one was at home.

The apartment contained four rooms. In the living room, the officers seized notebooks and papers containing figures. One of the notebooks had the defendant's name in it. A search of the kitchen uncovered a strainer and four plastic bags next to it. From a room without any furniture, the police seized an Ohaus triple-beam scale. This room also contained a postcard dated June 17, 1987, from a cablevision company addressed to the defendant at 41 Cross Street. The postcard confirmed an appointment with the defendant on June 19, 1987. An envelope, containing a birth certificate for one Tammy Nunez and some photographs, was also seized.

In the bedroom closet, the officers found a man's jacket with a bag of "white rocky powder" in the pocket. The powder was determined to be 21.24 grams of cocaine. From the same closet, the officers seized a white pocketbook containing three bags of "white rocky substance" which was later found to be

179.83 grams of cocaine. Additionally, the bedroom contained a Western Union money transfer application dated June 19 in the defendant's name.

While the officers were conducting the search, two Hispanic men knocked on the door of the apartment and were admitted. Both individuals were questioned, and both stated that they did not live in the apartment. A weapon was seized from one of the individuals, and he was placed under arrest. The other man was also detained.

Shortly thereafter, the defendant, accompanied by another Hispanic male, opened the apartment door with keys in his hand. The defendant identified himself to the police and admitted that he lived in the apartment. Lieutenant Jajuga brought him to a chair in the kitchen where he was shown the search warrant and the cocaine found in the jacket pocket. The defendant was placed under arrest. Sergeant Regan next produced the cocaine in the pocketbook and showed it to the defendant. Upon seeing the cocaine the defendant stated: "It's mine. My . . . girlfriend Tammy had nothing to do with it." The defendant was advised of his Miranda rights in English and acknowledged that he understood his rights. The defendant also signed a "Miranda card" in Spanish. Regan then "asked him [the defendant] once again" whether the cocaine was his. The defendant responded by stating once again: "It was mine. It is not my girlfriend's."[1] While this occurred, the defendant was surrounded by several officers.

The defendant's testimony at trial about the incident was materially different. The defendant testified that he had never been to the apartment before. When he first entered the apartment he was immediately grabbed and frisked by the officers,

---

[1] This account is drawn principally from Sergeant Regan's testimony. Lieutenant Jajuga's testimony was basically the same as Sergeant Regan's except for the following on Jajuga's cross-examination by the defendant's trial counsel.

DEFENSE COUNSEL: "Getting back to the items that were listed, sir, in your report . . . you stated that he explained that his wife-girlfriend had nothing to do with it. He just explained that before anybody said anything to him. He just blurted that out. Is that correct?"

LIEUTENANT JAJUGA: "That's correct, sir."

shown the weapon which had been taken earlier and asked: "What is this [weapon]? How do you explain this?" The defendant stated that when he told the officer that he did not know what the officer was talking about he was "grabbed" and "push[ed]" down into a chair in the kitchen, called a "liar" and a "little punk," and told to "shut up." The defendant stated that Sergeant Regan then produced the pocketbook containing the cocaine and asked: "How [do] you explain this?" The defendant indicated that he did not know what the officers were talking about. He was then "grabbed" and had his face pushed. One of the officers purportedly told the defendant: "This is yours. This stuff here is yours. Don't lie to me." The defendant responded by telling the officer to "remove your hands off my body. I don't have to answer to you any question." The defendant also testified that "Regan just stood there holding the pocketbook. Like he tried to put it in my face, tried to get words out of me, scaring me. But I was in the service and I was not scared or whatever the conversation was. The only thing I didn't want was the police to hurt me because I didn't have anything to do with anything or if I say what they didn't like, so I kept my mouth shut." The defendant's testimony concluded with further denials of living in the apartment or knowing anything about the cocaine in either the jacket or the pocketbook.

1. The matter of the defendant's first admission about the cocaine in the pocketbook came up in the testimony of Sergeant Regan. Regan was asked by the prosecutor what the defendant had said when he was confronted with this cocaine. The defendant's trial counsel [2] objected on the ground that the defendant "ha[d] not been advised of his rights" when he had become "a focus of [the] investigation." The defendant's trial counsel then asked the judge for a voir dire on whether the defendant had made the statement knowingly, that is, with knowledge and understanding of his Miranda rights. [3] The judge overruled

_____

[2] The defendant is represented by new counsel on appeal.

[3] The defendant's trial counsel did not object to this admission on the ground that it was involuntary. His new appellate counsel argues on appeal that both this admission and the subsequent admission were involuntary as

the objection and denied the request for a voir dire, commenting that "[t]his is [not] a custodial interrogation. He doesn't have to be advised [of his rights]."

The judge's ruling was based on the state of the case then before him. The prosecutor had made a short opening statement which outlined the Commonwealth's expected proof in very general terms but which contained no mention of any admissions by the defendant. Sergeant Regan had been called as the Commonwealth's first witness and had given brief testimony in direct examination about the execution of the search warrant, what had been seized, and the defendant's arrival at the apartment. Regan's testimony did not disclose that the defendant had identified himself as living in the apartment or that he had been placed under arrest shortly after his entry. Up to the point of the objection by the defendant's trial counsel, Regan's testimony left unclear what connection the defendant had with the apartment and the drugs and drug paraphernalia that had been seized. Based on the prosecutor's opening statement and the testimony of Sergeant Regan, the judge might have thought that, at the time the defendant appeared in the apartment, the police had no clear picture of his involvement and, as a result, that the police were still operating at an investigatory stage.

Despite the state of the evidence when the judge made his ruling, the objection made by the defendant's trial counsel was sufficient to raise (and preserve for appeal) the issue of the admissibility of the defendant's initial admission against an attack that it had been made in violation of the *Miranda* case. In certain respects, the situation resembles the situation in *Commonwealth* v. *Adams*, 389 Mass. 265 (1983), in which defense counsel, who had not filed a prior motion to suppress, objected to the introduction of incriminating statements of the defendant in the absence of Miranda warnings. The Court said:

---

well as procured in violation of the *Miranda* case. Voluntariness of an incriminating statement and compliance with *Miranda* pose different issues. See *Commonwealth* v. *Williams,* 388 Mass. 846, 851 n.2 (1983). We disregard the defendant's arguments on voluntariness in deciding the issues on appeal, although (as we will explain later) it will be necessary to inquire into the issue of the voluntariness of both admissions at the voir dire to be held before retrial.

"Even if the defendant has not moved to suppress his statements the burden is still on the Commonwealth, upon seasonable objection, to prove affirmatively, prior to the admission of [the defendant's] statements, that the statements were properly obtained and that the defendant waived his rights." 389 Mass. at 269-270.

While a pretrial motion to suppress or for a voir dire is the required method of challenging the admissibility of a defendant's incriminating statement, see Mass.R.Crim.P. 13(c)(2), 378 Mass. 873 (1979), defendants have been permitted to rely upon an objection made at trial. See *Commonwealth* v. *Adams*, 389 Mass. at 269-270 & n.1. See also *United States* v. *Vazquez*, 857 F.2d 857, 863-864 (1st Cir. 1988). When an objection is made at trial to the admission of a defendant's incriminating statement on the ground that it was obtained in violation of the *Miranda* case or was involuntary, or both, and no pretrial hearing has been held, the prudent thing for the judge to do is to stop the trial and conduct an appropriate inquiry.[4]

2. The defendant argues that his initial admission about ownership of the cocaine found in the pocketbook was the product of custodial interrogation made before he had been advised of his Miranda rights. The Commonwealth concedes that the defendant was in custody when he was confronted with this contraband. The concession is proper and is accepted. See *California* v. *Beheler*, 463 U.S. 1121, 1125 (1983) (Miranda warnings are required where there is a formal arrest or equivalent restraint of freedom). See also *Commonwealth* v. *Gil*, 393 Mass. 204, 212-213 (1984); *Commonwealth* v. *Shine*, 398 Mass. 641, 647-649 (1986).

The critical question therefore becomes: was the defendant interrogated? "Interrogation" for *Miranda* purposes is defined as "express questioning or its functional equivalent." *Rhode*

_____

[4] We also conclude that the objection by the defendant's trial counsel to the first admission preserved the defendant's right to challenge his second admission. The judge's ruling that he would allow in evidence the first admission obviously would have applied to the second, which closely followed the first and, according to the police testimony, was preceded by Miranda warnings. It would have been futile for the defendant's trial counsel to object again and to make a second request for a voir dire.

*Island* v. *Innis,* 446 U.S. 291, 300-301 (1980). The term "functional equivalent" encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. *Arizona* v. *Mauro,* 481 U.S. 520, 526-527 (1987). The focus of the inquiry is primarily on "the perceptions of the suspect,"[5] *Rhode Island* v. *Innis, supra* at 301, because the purpose of the *Miranda* rule is to prevent "government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona* v. *Mauro, supra* at 529-530. As has been suggested by one commentator, analysis under *Innis* "turns upon the objective purpose manifested by the police." Interrogation is present "if an objective observer (with the same knowledge of the suspect as the police officer) would . . . infer that the [officer's speech or conduct was] designed to elicit an incriminating response." White, Interrogation Without Questions: *Rhode Island* v. *Innis* and *United States* v. *Henry,* 78 Mich. L. Rev. 1209, 1231-1232 (1980). See *People* v. *Ferro,* 63 N.Y.2d 316, 319 (1984); *State* v. *Cunningham,* 144 Wis. 2d 272, 278 (1988).

On the testimony most favorable to the Commonwealth,[6] we conclude that the defendant's first admission, procured without Miranda warnings, to ownership of the cocaine in the pocketbook should have been suppressed. When the statement was made the defendant was under arrest, confined to a kitchen chair, and surrounded by police officers. He had been shown the search warrant. Two individuals who had been detained or arrested by the police were confined nearby. The police knew

---

[5] The subjective intent of the police has some limited relevance but that intent cannot require a finding that interrogation has or has not occurred. See *Arizona* v. *Mauro,* 481 U.S. at 526, 528-530.

[6] This would be Lieutenant Jajuga's testimony that the defendant "blurted out" that the cocaine was his. See note 1, *supra.* Because we conclude on the Commonwealth's best evidence as matter of law that there was improper interrogation as to the first admission, there is no need to have the matter reheard so that the findings of fact can be made. See *Commonwealth* v. *Delrio,* 22 Mass. App. Ct. 712, 718-719 (1986).

that the defendant lived in the apartment, that the cocaine in the jacket was most likely his, and that the quantity of cocaine found in the jacket, together with the other items that had been seized, particularly the scale and notebooks, indicated that the apartment was being used for large scale trafficking in cocaine. The police were not in the process of either discovering or securing (taking inventory of) the cocaine when the defendant made his first admission. Rather, the police were in the process of building a case against the defendant, and his admission to ownership of the cocaine in the pocketbook considerably enhanced the case against him.[7]

Showing the cocaine in the pocketbook to the defendant in this setting was clearly confrontational and had the force of an implicit question: "Is this yours?" An affirmative answer would prove the crime itself or link him to a joint venture. The fact that the defendant could have responded in a number of ways, including the denial of any knowledge, does not take the situation out of the purview of *Innis*. An "incriminating response" for purposes of impermissible interrogation includes any response by an accused, inculpatory or exculpatory, which can be used at trial to help prove guilt.[8]

---

[7] The 21.24 grams of cocaine found in the jacket would not have brought the defendant within the purview of G. L. c. 94C, § 32E(*b*), as in effect prior to St. 1988, c. 124, which called for a mandatory minimum three-year prison sentence for trafficking in more than twenty-eight grams of cocaine. A finding of ownership of the other 179.83 grams of cocaine found in the pocketbook would, however, make the offense one requiring a mandatory minimum prison sentence of ten years because more than 200 grams of cocaine were involved. G. L. c. 94C, § 32E(*b*)(3), as in effect prior to St. 1988, c. 124.

Keeping in mind that the police were members of a drug task force, and that Lieutenant Jajuga was qualified at the trial and gave testimony as an expert in the method of operation of drug traffickers, one can infer that it was important to the police to commit the defendant as early as possible to an admission or denial of ownership of the cocaine found in the pocketbook.

[8] This point was made in *Rhode Island* v. *Innis*, 446 U.S. at 301 n.5, as follows:

"By 'incriminating response' we refer to any response — whether inculpatory or exculpatory — that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda*:
'No distinction can be drawn between statements which are direct

We reject the Commonwealth's argument that the conduct of the officers was "ordinarily attendant to arrest and custody." There is nothing in the record to establish that someone who has been arrested is ordinarily shown the evidence against him as part of the arrest process so that he can admit or disclaim ownership. We also reject the Commonwealth's argument that the admission was not the product of interrogation because the defendant was motivated solely by the desire to clear his girlfriend of any wrongdoing. Even if that was the defendant's purpose, the *Miranda* case is designed to ensure that an accused has the requisite information about his rights before he responds to *any* interrogation. See *Oregon* v. *Elstaad*, 470 U.S. 298, 307 (1985) (even "patently voluntary statements taken in violation of *Miranda* must be excluded"). Quite simply, *Miranda* prohibits the use of any exculpatory or inculpatory statement resulting from interrogation in the absence of a showing that the accused has been warned of his rights and has waived them. Finally, the record does not support a finding that the admission was spontaneous. The admission followed Sergeant Regan's deliberate act of showing the defendant the cocaine, and it constituted a verbal response to a purposeful technique calculated to obtain information that could be used against the defendant.

3. The question of the admissibility of the defendant's second admission — when he repeated, after Miranda warnings, that the cocaine in the pocketbook was his — cannot be decided on

confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made was in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.' 384 U.S., at 476-477."

this record. Suppression of the first admission does not necessarily preclude admission of the second. The judge assigned the retrial must conduct a voir dire to inquire whether the second admission should be allowed in evidence under the standard set forth in *Oregon* v. *Elstaad*, 470 U.S. 298 (1985), for consideration of an admission made after compliance with the *Miranda* case but subsequent to an unwarned admission.[9] In resolving the matter, the judge will be required to take up the issue of the voluntariness of both admissions. *Id.* at 318.

4. If the defendant's second admission is introduced in evidence at retrial, and if its voluntariness is made a live issue, the judge should instruct the jury in accordance with the instruction outlined in *Commonwealth* v. *Tavares*, 385 Mass. 140, 152-153 (1982).

*Judgment reversed.*

*Verdict set aside.*

---

[9] As was said about the issue in *Oregon* v. *Elstaad*: "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." 470 U.S. at 314. Related Massachusetts cases (decided prior to *Elstaad*) are *Commonwealth* v. *Mahnke*, 368 Mass. 662 (1975), *Commonwealth* v. *Haas*, 373 Mass. 545 (1977), and *Commonwealth* v. *Watkins*, 375 Mass. 472 (1978).