995 A.2d 685

**Thomas SMITH**

v.

**STATE of Maryland.**

**No. 102, Sept. Term, 2009.**

Court of Appeals of Maryland.

May 17, 2010.

Brian L. Zavin, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore), on brief, for petitioner.

Jeremy M. McCoy, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

In this case we are asked to determine whether the Petitioner's ("Thomas Smith" or "Smith") statement to police that the "[drugs are] all mine," made during the execution of a search warrant at Smith's residence, was a product of police interrogation. For purposes of this opinion, we shall assume, without deciding, that Smith was in custody for purposes of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at the time he made the statement to the police.[1] Our focus is on the question of whether the lead investigator's act of showing Smith the contraband that the officers recovered from Smith's bedroom, coupled with the officer's announcement to the other officers present in the residence that everyone was to be arrested, amounted to interrogation, within the meaning of *Miranda,* under the circumstances of this case. For reasons that we shall explain in this opinion, we

---

1. At the suppression hearing, the State conceded that at the time Smith made the incriminating statement he was in custody for purposes of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the only issue in the case was "whether or not Smith was being interrogated." Neither the State nor the defense presented argument on the issue of custody under *Miranda* to the suppression court, and the suppression hearing judge concluded that custody had been established. *See Smith v. State,* 186 Md.App. 498, 523, 974 A.2d 991, 1005 (2009). In addition, the State purported to concede, when the case was before the intermediate appellate court, that Smith was in custody under *Miranda* when he made the incriminating statement. In *Miranda,* the United States Supreme Court set forth the meaning of "custodial interrogation," *i.e.,* "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. "[T]o protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation," the Supreme Court set forth "warnings that law enforcement personnel must deliver to a suspect before undertaking any custodial interrogation." *State v. Luckett,* 413 Md. 360, 377, 993 A.2d 25, 35 (2010) (quoting *Maryland v. Shatzer,* —— U.S. ——, ——, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045, 1052 (2010) (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719)).

shall affirm the judgment of the Court of Special Appeals holding that there was no violation of *Miranda*.

## I.

Smith's trial was held in the Circuit Court for Carroll County on charges of manufacturing crack cocaine, possession with intent to distribute crack cocaine, and possession of crack cocaine. The Circuit Court judge denied Smith's motion to suppress the evidence. After a trial, the jury returned verdicts of guilty of possession with intent to distribute crack cocaine and possession of crack cocaine. Smith was found not guilty of manufacturing crack cocaine. The court imposed a sentence of fourteen years' incarceration and suspended all but five years, with three years of supervised probation.

Smith noted a timely appeal to the Court of Special Appeals, which affirmed the judgment of the trial court. *Smith v. State*, 186 Md.App. 498, 549–50, 974 A.2d 991 (2009). Subsequently, Smith filed a petition for a writ of certiorari, which we granted, to consider the following questions:

1. Did the Court of Special Appeals err in affirming the judgment based on a ground conceded by the State at trial and on appeal and not discussed by the Court or parties at oral argument?

2. Did the Court of Special Appeals err in holding that Petitioner was not in custody for purposes of *Miranda* where a police SWAT team raided [Smith]'s apartment, handcuffed [Smith] and his guests, and blocked the entrance and exit while a search of [Smith]'s apartment was conducted?

3. Did the Court of Special Appeals err in holding that [Smith] was not subject to interrogation where a law enforcement official, knowing [Smith]'s desire to protect his girlfriend, confronted [Smith] with incriminating evidence and declared his intention to arrest [Smith]'s girlfriend?

Because our answer to the third question is that Smith was not subjected to interrogation, we need not, and do not, answer questions numbered one and two.

## II.

We review the Circuit Court's ruling on the motion to suppress and "consider only the facts and information contained in the record of the suppression hearing." *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). "The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous." *Prioleau v. State*, 411 Md. 629, 638, 984 A.2d 851, 856 (2009) (quoting *Rush v. State*, 403 Md. 68, 82–83, 939 A.2d 689, 697 (2008)). The foregoing notwithstanding, we "undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case." *Id.* (internal citations omitted).

Smith did not testify at the suppression hearing. Corporal Scott Peter, who led the investigation, and Detective James Pullen testified. These two officers, along with two other law enforcement officers, participated in the execution of the search warrant at Smith's residence, located at 16 Pennsylvania Avenue, Apartment 13, Westminster, Carroll County. Prior to the officers' entry into the premises, according to the record of the suppression hearing, "a SWAT team had secured everyone" by placing the occupants, Smith, his girlfriend Kathy Magruder, Alan Magruder, and Heather Myers, in restraints. Smith was restrained with "flex cuffs" and initially detained in the "living room/dining area." Kathy Magruder, Alan Magruder, and Heather Myers were restrained also with "flex cuffs," but detained outside the apartment on the balcony. During the search, Smith, while in handcuffs, was permitted to remain in the apartment, but was instructed to sit on the living room sofa. During the search of Smith's apartment, his guests remained outside on the balcony. One of the law enforcement officers, Officer Angela Anderson, "posted" herself at the front door, apparently to control traffic in and out

of the apartment while the other three officers conducted the search.

Corporal Peter searched the kitchen and recovered what he suspected to be crack cocaine from a glass bowl inside the microwave. Corporal Peter and Detective Pullen recovered from inside a sock drawer, in the only bedroom in the apartment, a plastic bag containing what they suspected to be an ounce of crack cocaine.

During direct examination by the prosecutor, Corporal Peter explained his actions upon viewing the plastic bag of suspected crack cocaine recovered from the bedroom drawer:

I secured it. I took it. At that time, I had walked by Smith and showed Mr. Smith what it was and basically told—made an announcement to the other officer that we were going to arrest [sic] that was in the premise at that time and people who was [sic] seen going in and out of the premise also.

Further, on cross-examination, Corporal Peter pointed to additional details surrounding his interaction with Smith. The corporal testified:

Q Demonstration [sic] if you could, sir, with this baggie that I have. If you would, show me how you demonstrated or how you showed this to Mr. Smith? Mr. Smith was seated on the sofa?

A He was standing in the hallway when it happened.

Q He was standing?

A I believe so, yes.

Q He was not seated at the sofa?

A No, he wasn't. He was standing in the hallway between the bedroom and the living room.

Q Okay but previously he was seated on the edge of the sofa.

A He had been on the sofa yes.

Q In fact on the arm of the sofa?

A I don't know if it was the arm of the sofa, but he was sitting on the little sofa there.

Q  So, your testimony is he is standing at some point. Could you show me, if you would, demonstrate to me how you showed the baggie to him?

A  I had it in my hand, I walked by, showed it to him (indicating) found this in your room, kept going and advised other officers there everyone is under arrest. Saw everyone going out of the apartment, I am going to arrest everybody here.

To clarify what he meant by "I am going to arrest everybody here," Corporal Peter explained that he was referring to "the subjects ... that had been detained also, which would have been Kathy MacGruder [sic], Heather Myers and Alan MacGruder [sic], [who] were out on the front balcony of the apartment." He further stated that he "had watched them go in and out of the apartment while ... doing pre-raid surveillance of the location."

While Corporal Peter explained that his reason for displaying the crack cocaine to Smith was to "show[ ] him what [had been] found and what [Smith] was going to be arrested for," the corporal admitted that he did not show Smith all the evidentiary items found in the apartment. Corporal Peter's testimony also revealed that because of his "familiarities" with Smith, he knew that Smith and Kathy Magruder were boyfriend and girlfriend.

"[A]lmost instantaneous[ly]" or "[s]econds" after Corporal Peter announced his intention to arrest Smith and his guests, according to Detective Pullen and Corporal Peter, respectively, Smith said, with regard to the drugs that had been displayed to him, "it is all mine." Smith made that admission of ownership at least twice, and at the time that he uttered the statement he had not been read any *Miranda* warnings. At the suppression hearing, Corporal Peter was asked to give his impression as to why Smith acknowledged responsibility for the drugs found in his bedroom. According to Corporal Peter, Smith made the admission because "he saw that [the police] were going to arrest his girlfriend ... [and] he wanted to protect [her]."

After Smith made his incriminating statement, he and his three guests were formally arrested and transported to the station for booking. Upon completing the search of Smith's apartment, Corporal Peter left a copy of the search warrant and inventory of the seized items "on the table . . . above the microwave" in the kitchen. He indicated on the search warrant return that the "location of [the] search warrant was unoccupied and [that a] copy [of the inventory was] left in [a] conspicuous location."

At the suppression hearing, the prosecutor and defense counsel argued their respective positions on whether Smith's incriminating statement was the product of police interrogation. The State maintained that it was not, and the defense contended that it was. The suppression judge denied Smith's motion to suppress. The judge stated in relevant part:

Well, no question, I think everyone concedes that at the time the statement was made, the defendant was in custody. The issue then was there any interrogation? And I find that based upon the facts as testified to, there is no evidence there was any interrogation. Certainly showing someone evidence in and of itself, I don't think there was any invitation to respond. I don't think that there is anything here that would suggest, I didn't hear anything, that would suggest that this was done in any type of taunting fashion.

I think that just showing someone the evidence followed by the statement that everybody is going, I don't think that that invites any response. I think that if defendant says anything at that point, it is certainly unsolicited and at his own [peril].

In affirming the judgment of the Circuit Court, the Court of Special Appeals concluded that Smith was not in custody under *Miranda* until after his formal arrest and that Corporal Peter's announcement, which preceded his formal arrest, did not constitute interrogation. *Smith*, 186 Md.App. at 539, 974 A.2d at 1020. As pointed out at the beginning of this opinion, we need not, and do not, decide the issue of custody. On the record before us, it is clear that Corporal Peter's announce-

ment and actions in showing Smith the drugs recovered during the search of his apartment did not amount to interrogation or the functional equivalent of interrogation.

### III.

Smith maintains that the announcement that everyone present at the apartment would be arrested, in conjunction with the presentment of some of the incriminating evidence found, constituted interrogation. Borrowing language from the United States Supreme Court's decision in *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 308 (1980) (footnotes omitted), Smith contends that "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect" amounts to interrogation, and that Smith's response, it's "all mine," should have been suppressed. Smith offers as further support for his position the cases of *Drury v. State,* 368 Md. 331, 793 A.2d 567 (2002), and *Commonwealth v. Rubio,* 27 Mass.App.Ct. 506, 540 N.E.2d 189 (1989).

The State counters that, even assuming that Smith was in custody for purposes of Miranda, Corporal Peter's act of showing Smith what he had recovered during the search and his statement to fellow officers that everyone was to be arrested did not constitute interrogation. According to the State, Smith's statement claiming ownership of the drugs was a classic "blurt," and not a product of interrogation. Further, the State contends that in order for Corporal Peter's action and statement to be interrogation, relying on *Innis,* 446 U.S. at 302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308, they "must reflect a measured compulsion above and beyond that inherent in custody itself." In other words, the State asserts that, without more, no reasonable law enforcement officer would believe that by announcing that everyone on the premises will be arrested and showing the suspect the evidence recovered would likely elicit an incriminating response from the suspect. Thus, the State concludes that *Drury,* 368 Md. 331, 793 A.2d 567, is factually distinguishable because, unlike the defendant in *Drury,* Smith was not removed from his home for the

express purpose of questioning, no evidence of drugs was used in the questioning of Smith, and Corporal Peter did not reveal to Smith that what was recovered during the search was shown to Smith for the purpose of questioning him. In addition, according to the State, *Rubio* is distinguishable because, unlike the defendant in *Rubio*, Smith was not subject to police confrontation, implicit questioning, or "a purposeful technique calculated to obtain incriminating evidence."

Recently this Court pointed out that not every question posed to a suspect in custody or in a defendant's presence by a law enforcement officer constitutes interrogation. *Prioleau*, 411 Md. at 639, 984 A.2d at 857. In *Prioleau*, 411 Md. at 651, 984 A.2d at 864, we held that the statement "What's up, Maurice?," made by a law enforcement officer to the suspect, did not constitute actual interrogation or the functional equivalent of interrogation under the circumstances of that case, regardless of whether the statement was a question or a greeting. We explained that every meeting between a law enforcement officer and a suspect should not be considered an interrogation. *Prioleau*, 411 Md. at 639, 984 A.2d at 857. Further, we pointed out that the critical inquiry is "whether the police officer, based on the totality of the circumstances, knew or should have known that the [words spoken or actions taken] were reasonably likely to elicit an incriminating response." *Prioleau*, 411 Md. at 643, 984 A.2d at 860 (internal citations omitted).

The United States Supreme Court, in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), acknowledged that "the functional equivalent of interrogation can occur even if the defendant is not asked a single question." *Prioleau*, 411 Md. at 646, 984 A.2d at 861. In *Innis*, the defendant made an incriminating statement in response to a conversation that he overheard between police officers who were transporting the suspect to the police station. 446 U.S. at 295, 100 S.Ct. at 1687, 64 L.Ed.2d at 304. In explaining the concept of custodial interrogation, the *Innis* Court said:

[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or

its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of the police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 300–02, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 307–08 (footnotes omitted).

In the present case, we are not persuaded that Corporal Peter should have known that his action and words would likely evoke an incriminating response from Smith. It was not reasonably foreseeable that Smith would admit ownership of the drugs in response to Corporal Peter's announcement to arrest everybody and his display of the drugs, anymore than it was reasonably foreseeable that Smith would blurt out a confession to exonerate his girlfriend. Smith was standing in the hallway of his apartment when Corporal Peter displayed the drugs. He did not stop in front of Smith in order to elicit a statement from him; rather, Corporal Peter walked past Smith, and as he continued walking, he announced to other officers present to place everybody under arrest. The corporal's actions did not demonstrate conduct calculated to elicit an incriminating statement.

Corporal Peter testified that his purpose in showing Smith the drugs was to inform him of why he was being arrested and that he ordinarily shows all suspects the contraband recovered during a drug arrest. This testimony was not rebutted. In addition, Corporal Peter testified that there were no attempts by the police to question Smith about any of the evidence recovered as a result of the search. Moreover, according to the corporal, his announcement to place everyone under arrest was not directed at Smith, but rather was an instruction to his fellow officers to arrest all individuals on the premises.

The facts and circumstances of this case are unlike those in *Drury*. In that case, we held that the statements that Drury made prior to being advised of his *Miranda* rights resulted from the functional equivalent of interrogation within the meaning of *Innis*. *Drury*, 368 Md. at 337, 793 A.2d at 571. While in police custody, a police officer "made a statement to [Drury] and displayed the tire iron [allegedly used in a burglary] and [stolen] magazines," under circumstances where Drury "had been brought to the police station for the express purpose of questioning and, in fact, had been told so by Corporal Whaley." *Id.* We explained:

It appears to us that the only reasonable conclusion that can be drawn from the foregoing facts is that the officer should have known, in light of his having told [Drury] that he was being brought in for questioning, that putting the evidence before [Drury] and telling him that the items were going to be fingerprinted was reasonably likely to evoke an incriminating response from him. The only plausible explanation for the officer's conduct is that he expected to elicit a statement from [Drury].

*Id.*

In *Drury* we also pointed out that "the police conduct in th[at] case was not routine police procedure nor 'innocuous comment.'" *Drury*, 368 Md. at 341, 793 A.2d at 573. Specifically, we underscored that "Corporal Whaley's actions were aimed at invoking an incriminating remark." *Id.* The facts and circumstances in the present case are more analogous to

those in *Williams v. State,* 342 Md. 724, 679 A.2d 1106 (1996). While under arrest and in response to Williams' inquiry about why he was arrested, the police informed Williams that he was under arrest for two murders. *Williams,* 342 Md. at 759, 679 A.2d at 1124. After Williams was given his *Miranda* rights, he invoked his right to remain silent and requested an attorney. *Id.* While the police officers were gathering their papers, one of them told Williams to remove his earring, and Williams responded, "you can't get me. I'll just say a girl gave me the card." *Id.* One of the police officers made the comment that "[t]his is going to work" and again told Williams that he was charged with two murders. *Id.* Williams next said, "I know I'm never getting out." *Id.*

We held that the statements mentioned above were not the result of interrogation because the words and actions of the police after the *Miranda* warnings were given were not reasonably likely to elicit an incriminating response. *Williams,* 342 Md. at 760, 679 A.2d at 1125. We pointed out that the officers, in gathering their papers and telling Williams to remove his earring, were engaged in "routine procedures that the officers could hardly be expected to anticipate would prompt an incriminating statement." *Williams,* 342 Md. at 760–61, 679 A.2d at 1125. Likewise, in *Vines v. State,* 285 Md. 369, 402 A.2d 900 (1979), we held that there was no interrogation in violation of *Miranda.* Vines was arrested in his residence during the execution of a search warrant and subsequently taken to the police station for booking. *Vines,* 285 Md. at 372, 402 A.2d at 901. He was advised of his *Miranda* rights, and he invoked his right to remain silent. *Id.* After advisement of his *Miranda* rights and after booking, he was taken to the roll call room where, displayed on a table, was the contraband that the police had recovered from Vines's home pursuant to the search warrant. *Vines,* 285 Md. at 372, 402 A.2d at 901–02. He was given a copy of the search warrant, including the inventory of the property seized, and told that "this is what was recovered from [your] house during the raid." *Vines,* 285 Md. at 373, 402 A.2d at 902. Following the

officer's comments, Vines said, "it was his stuff" and asked "what he could do to help himself out." *Id.*

In explaining the basis for our holding that there was no interrogation in violation of *Miranda*, we focused on the officer's statements and action communicated to Vines. Vines was given a copy of the search warrant containing the inventory of the property taken. This was done "in compliance with [the] Maryland Rule[s] ... [which] provided that an officer taking property under a search warrant shall make a written inventory of the property taken" and furnish a copy of the search warrant and inventory to the person from whom the property was taken. *Vines*, 285 Md. at 377, 402 A.2d at 904. Consistent with the Maryland Rules, the officer made a "true statement that this was what was recovered from Vines' house during the raid." *Vines*, 285 Md. at 378, 402 A.2d at 904. Giving Vines a copy of the warrant containing the inventory, "coupled with the simple factual statement by the police [connecting the contraband to the inventory], was not tantamount to an 'interrogation' within the meaning of *Miranda.*" *Vines*, 285 Md. at 378, 402 A.2d at 904–05. We also pointed out in *Vines* that neither the police officer's "display [to the suspect] of some of the property taken" nor "a confrontation [between the police and the suspect] with some of the physical evidence listed in the inventory" amounted to an "interrogation" in violation of *Miranda. Vines*, 285 Md. at 378, 402 A.2d at 905.

Finally, Smith asserts that we should follow the Appeals Court of Massachusetts in *Rubio* and hold that the display, to Smith, of the drugs seized from his bedroom was tantamount to interrogation, thus implicating *Miranda.* Rubio is factually distinguishable. Rubio entered his home during the police execution of a search warrant and was arrested. *Rubio*, 540 N.E.2d at 190. He was confined to a kitchen chair and surrounded by several police officers and questioned. *Rubio*, 540 N.E.2d at 190–91. According to Rubio's testimony, "Sergeant Regan ... produced [a] pocketbook containing ... cocaine and asked: 'How [do] you explain this?' " *Rubio*, 540 N.E.2d at 191. Further, according to Rubio, he "did not know

what the officers were talking about." *Id.* Next, according to Rubio, "[h]e was then 'grabbed' and had his face pushed. One of the officers purportedly told [Rubio]: 'This is yours. This stuff here is yours. Don't lie to me.'" *Id.* As to his version surrounding the police confrontation at the apartment, Rubio made no incriminating statements. *Id.* Sergeant Regan recounted a slightly different version of the events. While Rubio was confined to the kitchen chair, one officer showed him "the search warrant and the cocaine found in [a] jacket pocket." *Rubio,* 540 N.E.2d at 190. After Rubio was arrested, Sergeant Regan showed Rubio the cocaine (179.83 grams) found in a pocketbook recovered from a bedroom closet. *Id.* "Upon seeing the cocaine [Rubio] stated: 'It's mine. My . . . girlfriend Tammy had nothing to do with it.'" *Id.* Then Rubio was given his *Miranda* warnings and asked once again whether the cocaine was his. *Id.* He "responded by stating once again: 'It was mine. It is not my girlfriend's.'" *Rubio,* 540 N.E.2d at 190–91. In holding that Rubio's admission to ownership of the cocaine in the pocketbook was the product of interrogation, the court explained that the admission was "a verbal response to a purposeful technique calculated to obtain information that could be used against the defendant." *Rubio,* 540 N.E.2d at 194. The evidence recovered from the apartment was deliberately shown to Rubio not "as part of the [ordinary] arrest [and custody] process," but to force Rubio to "admit or disclaim ownership." *Id.*

In the present case, there was no interrogation because an objective observer would not reasonably infer that Corporal Peter's statement or conduct was designed to elicit an incriminating response. Given that the purpose of providing *Miranda* warnings to a suspect subject to custodial interrogation is to prevent "government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment," *Arizona v. Mauro,* 481 U.S. 520, 529–30, 107 S.Ct. 1931, 1937, 95 L.Ed.2d 458, 468 (1987), the facts of this case do not warrant application of the *Miranda* rule. In short, Smith was subjected to neither

"express questioning [n]or its functional equivalent." *Innis,* 446 U.S. at 300–01, 100 S.Ct. at 1689, 64 L.Ed.2d at 307–08.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.

Judge MURPHY joins in the judgment only.