## COMMONWEALTH *vs.* JOHN F. SMITH.

Worcester. February 4, 1992. - June 10, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Waiver of constitutional rights. *Waiver. Evidence*, Admissions and confessions, Nonexistence of evidence. *Practice, Criminal*, Voluntariness of statement, Argument by prosecutor.

Where police obtained a custodial statement from a criminal defendant before advising him of his Miranda rights and then, after advising him of his rights, continued the interrogation and obtained a second custodial statement from him, this court, declining to apply the rule of Federal constitutional law announced in *Oregon* v. *Elstad*, 470 U.S. 298 (1985), concluded that, as matter of State common law, the admissibility of the second statement in evidence at the defendant's trial would be governed by the more restrictive principles previously stated in *Commonwealth* v. *Haas*, 373 Mass. 545 (1977). [829-832, 835-837] No-LAN, J., dissenting.

In the case of a criminal defendant from whom police obtained a custodial statement before advising him of his Miranda rights and then, after advising him of his rights, obtained a second custodial statement, the principles stated by this court in *Commonwealth* v. *Haas*, 373 Mass. 545 (1977), required that the defendant's suppression motion be allowed as to the second statement, where the inculpatory quality of the first statement was conclusively established by prior knowledge of the police and where the record contained no evidence that any "break in the stream of events" had occurred to remove the taint of the first, illegally obtained, statement. [832-835]

At a murder trial, it was appropriate for the prosecutor, during closing argument, to inform the jury that they did not need to credit completely the testimony of a certain prosecution witness in order to convict the defendant. [837]

At a murder trial, the defendant was not entitled to a jury instruction on the failure of the police to conduct certain scientific tests. [838]

INDICTMENTS found and returned in the Superior Court Department on November 9, 1989.

A pretrial motion to suppress evidence was heard by *Robert V. Mulkern*, J., and the cases were tried before him.

*Charles K. Stephenson* for the defendant.

*Sean J. Gallagher*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant on two indictments charging murder in the first degree. On appeal, the defendant argues that a custodial statement obtained from him by the police was erroneously admitted in evidence at his trial. We agree, and conclude that, where Federal law requires the administration of Miranda warnings to a person in custody, the admissibility of incriminatory statements obtained in the circumstances that appear here will, as matter of State common law, be governed by principles stated in *Commonwealth* v. *Haas*, 373 Mass. 545 (1977), *S.C.*, 398 Mass. 806 (1986). As a consequence, there must be a new trial. We also comment briefly on some issues that may arise at the retrial.

The relevant background to this case may be summarized as follows. The victims, Anna M. Duclos and Emile J. Duclos, lived in the town of Winchendon with their son, William, age nineteen. William Duclos had left high school after the eleventh grade and had started a business on the family property raising pigs and rabbits for sale; he frequently employed the defendant to do carpentry work and various odd jobs. The defendant was eighteen years of age and, like William Duclos, had left high school before graduating.

William Duclos had not been on friendly terms with his mother for several years, and relations between the defendant and Duclos's mother were also poor.[1] Several weeks

---

[1] Duclos told the police that his mother "bitched, complained all the time to me and my father did everything she wanted." He wrote in a letter from jail that "the only reason [the killings] took place is my mother treated me shity [*sic*]."

The hostility between the defendant and Anna Duclos arose out of an incident one year before the killings, where the defendant attempted to

before the killings, a dispute arose between Duclos and his mother regarding the proceeds of an insurance policy, and relations between them consequently worsened. On the morning of May 22, 1989, Duclos testified, he and the defendant agreed on a plan to kill Anna and Emile Duclos that evening and "make it look like a robbery." The defendant testified that it was Duclos alone who decided to kill his parents that evening, that he did not think Duclos was serious, but nevertheless told him that it was not a good idea.

At approximately midnight on May 22, 1989, William Duclos went from his home to the residence of his grandmother next door. Appearing to be shocked and anguished, he woke her and told her his parents had been shot. She immediately made a telephone call to the police. The officers who responded to the call found the bodies of Anna and Emile Duclos in their bedroom; Anna Duclos had been shot twice and Emile Duclos three times. William Duclos was asked to come to the Winchendon police station to give a statement. There, he admitted to the police that he had participated in the shootings, but asserted that the defendant had actually fired the shots. The defendant, who was also requested to come to the station, gave a statement admitting that he was on the Duclos property at the time of the shootings, that he took a purse and wallet from the Duclos home and scattered papers on the first floor in order to create the appearance of a burglary, and that he helped William Duclos dispose of the guns and other evidence, but stated that Duclos alone had shot his parents. At the defendant's trial, his statement was read in evidence during the Commonwealth's case-in-chief. The issue of its admissibility is the defendant's primary ground of appeal.

The circumstances under which the defendant made the contested statement, as set forth in the hearing on his motion

take a gun from the Ducloses' house in order to shoot his own mother. Anna Duclos stopped him, reported the incident to his mother, and would not allow him inside her home for several months afterward.

to suppress, are as follows.[2] When William Duclos ·was brought in for questioning, he initially told the interrogating officers that after he left his girl friend's house that evening at about 9:30 P.M., he went to the defendant's house and that the two went "four-wheeling" in Duclos's truck for "quite a while." He said that, after dropping the defendant off at his house, he arrived home at about 11:30 P.M. and found that his parents had been shot. After one of the officers questioned him about the blood spatterings on his socks, Duclos abandoned this alibi, admitted having participated in the killings, and told the police of the plan by which he and the defendant had killed his parents. According to Duclos's statement, he and the defendant agreed that morning on a plan to kill his parents, and Duclos showed the defendant the rifles they would use and explained how to fire them. At about 10 P.M. that evening, he and the defendant drove to the Duclos home and Duclos went inside. The defendant waited outside for a little over an hour, until Duclos signalled to him that his parents had retired for the night and that he should come inside. Duclos then handed the defendant one of two rifles he had taken from the gun cabinet in his bedroom. He and the defendant, each with a rifle, then went upstairs, where the defendant shot Anna Duclos twice and Emile Duclos three times. Afterwards, Duclos changed his clothes, while the defendant scattered papers on the floor downstairs.

Police officers at the station made a telephone call to the defendant at his residence at about 2 A.M., after Duclos had

---

[2]The judge made no formal written findings of fact or memorandum of law regarding the suppression motion. Rather (perhaps due to the necessity of starting the trial), the judge dictated into the record limited findings of fact and rulings of law which were cast in general terms. The evidence before us consists of the statements given by Duclos and by the defendant on the morning of May 23, 1989 (the statements were not recorded, but were prepared by Sergeant Bradley Mullen, one of the interrogating officers, and were signed by the suspects), and the transcript of the motion hearing. We consider the evidence in the light most favorable to the Commonwealth, and conclude as a matter of law that the statement was erroneously admitted. See *Commonwealth* v. *Rubio*, 27 Mass. App. Ct. 506, 512 & n.6 (1989).

named him as an alibi witness.[3] The defendant agreed to accept a ride to the station, ten miles away, and he arrived about one hour later, unaccompanied by either a family member or friend. The defendant waited at the station for about three hours before being interrogated; he spent much of this time in the "radio room" talking with Kathleen Whipple, Duclos's girl friend (whom Duclos had also named as an alibi witness), and her father.

At 6:05 A.M., Sergeant Bradley Mullen of the State police and Officer Michael Young of the Winchendon police department began their interrogation of the defendant. They had already concluded their interview with William Duclos and, consequently, were aware of Duclos's statement incriminating himself and the defendant. Before starting the questioning, they did not inform the defendant of his Miranda rights or his right under G. L. c. 276, § 33A (1990 ed.), to use the telephone.[4] Instead, Sergeant Mullen began the interrogation by telling the defendant that he would "like to talk to him about his activities during the day." The defendant replied that during the day, he had worked with William Duclos. In the evening, he told the officers, Duclos had picked him up at about 9:30 P.M. The two then "spent two hours or so 4 wheeling," and Duclos dropped him off at his home at about 11:30 P.M. The defendant's report of his activities during the evening thus duplicated the alibi that Duclos had ini-

---

[3]By the time the police finished their interrogation of Duclos three hours later, he had implicated the defendant in the killings, with the result that the defendant was no longer an alibi witness but a suspect in the crimes.

[4]The Commonwealth did not dispute that the defendant's interrogation was custodial; both officers testified at the suppression hearing that once the interrogation had begun, the defendant would have been arrested had he attempted to leave. Consequently, the Commonwealth did not argue that the statements made by the defendant prior to receiving his Miranda warnings were admissible. The explanation for Sergeant Mullen's failure to give the defendant his Miranda warnings prior to starting the interrogation was that when the interview began, Duclos's statement implicating the defendant was uncorroborated, and Sergeant Mullen "did not feel initially that Miranda was required." At the time of the interrogation, Sergeant Mullen had been a police officer for eighteen years, and he knew that the defendant was eighteen years of age.

tially given. In response to further questioning, the defendant stated that Duclos's relationship with his parents was "[f]ine," and he denied that he or Duclos had ever discussed killing Duclos's parents. At this point, Sergeant Mullen advised the defendant of his Miranda rights.[5] The defendant signed the Miranda card and told the officers that he was willing to talk to them; the interrogation continued. Mullen next inquired if the defendant had ever fired Duclos's guns, or seen them, and the defendant responded that he had seen the guns the previous day and that Duclos had fired the guns in his presence, but that Duclos did not allow him to fire the guns. Sergeant Mullen then remarked that he did not believe that the defendant was telling the truth, and he informed the defendant that Duclos had implicated him in the murders.[6] The defendant then repudiated the alibi he had originally offered and made the statement that was read at his trial, in which he admitted that he was on the Duclos property at the time of the shootings, that Duclos had told him to scatter papers around to create the appearance of a burglary on the first floor of the Duclos home and that he had done so, that he had taken Anna Duclos's purse and Emile Duclos's wallet to substantiate the appearance that a burglary had occurred, and that he had helped William Duclos to throw the guns, clothing, and other evidence into a "lake." The defendant denied that he had shot Duclos's parents and denied that he had been upstairs in the house that evening. The interrogation of the defendant began at 6:05 A.M., and concluded at 7:15 A.M., when the defendant signed the statement prepared by Sergeant Mullen. The defendant conceded that Sergeant Mullen had treated him like a "gentleman."

---

[5]Officer Young testified that the defendant was also informed of his right to use the telephone at this time. Sergeant Mullen, however, testified that the defendant was not informed of this right until the interrogation was over.

[6]The defendant's statement, as prepared by Sergeant Mullen, states that at this point the defendant was "[a]dvised of statement made by Bill Duclos and agrees to tell truth." Sergeant Mullen testified that he did not provide the defendant with any details of Duclos's story.

In ruling on the suppression motion, the judge ordered that the statements made by the defendant before being advised of his Miranda rights were to be excluded, but he ruled that the statements made after the defendant received his Miranda rights were voluntary and admissible.[7]

Under Federal constitutional law prior to the decision of the United States Supreme Court in *Oregon* v. *Elstad*, 470 U.S. 298 (1985), discussed below, an admission or confession of guilt obtained from an accused person in violation of the Miranda requirements was presumed to taint any subsequent confession made by the accused, and the taint could not be dissipated solely by giving Miranda warnings. *Commonwealth* v. *Haas*, 373 Mass. 545, 554 (1977). This principle was followed in both Federal and State courts. See, e.g., *United States* v. *Lee*, 699 F.2d 466, 468-469 (9th Cir. 1982); *United States* v. *Nash*, 563 F.2d 1166, 1169 (5th Cir. 1977); *Randall* v. *Estelle*, 492 F.2d 118, 120 (5th Cir. 1974); *Fisher* v. *Scafati*, 439 F.2d 307, 311 (1st Cir.), cert. denied, 403 U.S. 939 (1971); *Gilpin* v. *United States*, 415 F.2d 638, 641-642 (5th Cir. 1969); *United States* v. *Pierce*, 397 F.2d 128, 131 (4th Cir. 1968); *People* v. *Jordan*, 90 Ill. App. 3d 489, 495 (1980); *State* v. *Elstad*, 61 Or. App. 673, 676 (1983); *Commonwealth* v. *Wideman*, 460 Pa. 699, 708-709 (1975); *State* v. *Badger*, 141 Vt. 430, 439-440 (1982); *State* v. *Lavaris*, 99 Wash. 2d 851, 857-860 (1983). The presumption of taint was intended to deter law enforcement officials from circumventing the Miranda requirements by using the warnings strategically — first questioning the suspect without benefit of the warnings, and then, having obtained an incriminating response or having otherwise benefited from the coercive atmosphere, by giving the Miranda warnings and questioning the suspect again in order to obtain an admissible statement. The presumption of taint is also consistent with the constitutional principle that the government bears

---

[7]At trial, the judge properly instructed the jury that, before they could consider the statement, they must find beyond a reasonable doubt that it was voluntarily made. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152-153, cert. denied, 457 U.S. 1137 (1982).

the burden to show that a defendant's custodial statement was freely willed. *Jackson* v. *Denno*, 378 U.S. 368, 376-377 (1964).

In order to determine whether the taint from an illegal interrogation has been eliminated, and, consequently, whether a subsequent statement is admissible, case law here has followed two lines of analysis "to order[ ] and evaluat[e] the necessary elements of the circumstances which bear on the voluntariness of the later statements." *Commonwealth* v. *Mahnke*, 368 Mass. 662, 682 (1975), cert. denied, 425 U.S. 959 (1976).[8] These two approaches were described, *id.* at 682-683, as follows: "In the first line of analysis, the court must look for a 'break in the stream of events,' the coercive circumstances which extracted earlier statements, 'sufficient to insulate the [subsequent] statement from the effect of all that went before.' *Clewis* v. *Texas*, [386 U.S. 707, 710 (1967)]. The focus of this line of analysis is on external constraints, continuing or new, which may have overborne the defendant's will. When circumstances no longer coerce the defendant, a break in the stream has occurred. The second line of analysis looks more specifically to the effect of the previous confession on the defendant's will. To be admissible, subsequent statements may not be 'merely the product of the erroneous impression that the cat was already out of the bag' (*Darwin* v. *Connecticut*, 391 U.S. 346, 351 [1968] [Harlan, J., concurring and dissenting]) because one coerced confes-

---

[8]The admissibility of such a statement has been evaluated in a variety of ways. For example, some decisions have held that a second statement is inadmissible where the suspect is not informed of the invalidity and inadmissibility of the earlier statement. See *Fisher* v. *Scafati*, 439 F.2d 307, 311 (1st Cir.), cert. denied, 403 U.S. 939 (1971); *State* v. *Edwards*, 284 N.C. 76, 80-81 (1973). In the analogous case of *Brown* v. *Illinois*, 422 U.S. 590, 603-604 (1975), which involved the voluntariness of statements made after a warrantless arrest without probable cause, the Court considered, in addition to the administration of Miranda warnings, "[t]he temporal proximity of the arrest and the confession," "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct."

sion has let the secret 'out for good.' *United States* v. *Bayer*, 331 U.S. 532, 540 (1947)."

Applying these principles in *Commonwealth* v. *Haas*, *supra* at 554, we ordered the suppression of a second custodial statement made by the defendant after police had obtained an admission from him in a situation where Federal law required that Miranda rights be given. Suppression was required despite the fact that the defendant's second statement was found to have been made voluntarily after the knowing and intelligent waiver of his Miranda rights. Applying the "break in the stream of events" analysis, we held that "the proper police questioning followed so closely their illegal interrogation [that] we cannot discern a break in time or the stream of events sufficient to insulate the latter statement from the events which went before." *Id.* We also concluded that the admission made by the defendant prior to receiving his Miranda warnings (that he had left his home for work that morning at 6:30), had let the cat out of the bag, and that " '[a] belated adequate warning could not put the cat back in the bag.' " *Id.*, quoting *Gilpin* v. *United States*, 415 F.2d 638, 642 (5th Cir. 1969).

In *Commonwealth* v. *Watkins*, 375 Mass. 472, 482 (1978), a case involving a suspect's invocation of his right to counsel, we ruled that a second custodial statement made by the suspect was admissible. Applying the "break in the stream of events" analysis, we concluded that, because the defendant's second statement was made after he was given the opportunity to communicate with an attorney and after he had a lengthy telephone conversation with his mother and his sister, "[t]he 'temporal proximity' of the prior illegally obtained statements to the subsequent statements [was] overshadowed by the presence of such 'intervening circumstances'" (citations omitted). *Id.* The "cat out of the bag" theory was inapplicable in *Watkins*, we ruled, because the defendant's first statement to the police was not inculpatory, and only his later statement described his involvement in the crimes.

In the 1985 case of *Oregon* v. *Elstad, supra,* the United States Supreme Court rejected the rule of presumptive taint. The rule of Federal constitutional law enunciated in the *Elstad* case is that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314.

The judge in the present case found that the defendant was not coerced or pressured into making his statements, that he was not under the influence of alcohol or drugs at the time of the interrogation, and that he exhibited self-control and was willing to talk to the police. This evidence supports the judge's ultimate finding that the defendant's statements were voluntary and, therefore, that his second statement would be admissible as a matter of present Federal constitutional law. *Oregon* v. *Elstad, supra.* See *Commonwealth* v. *Rubio,* 27 Mass. App. Ct. 506, 514-515 (1989); *Bryant* v. *Vose,* 785 F.2d 364, 366-368 (1st Cir.), cert. denied, 477 U.S. 907 (1986).

The defendant argues, however, as he did in the Superior Court, that we should continue to follow the requirements that we set out in *Commonwealth* v. *Haas, supra.* Under the principles of that case, we conclude, the suppression of the defendant's subsequent statement would be required.

. In ruling on the defendant's suppression motion, the judge made no findings on the issue whether a "break in the stream of events" had occurred to remove the taint of the first, illegally obtained, admission. The record demonstrates, however, that there was no evidence before the judge to have allowed him to conclude that such a break had taken place; both statements were the result of a single continuous interrogation. The judge did make findings with respect to the second line of analysis. He ruled that the "cat out of the bag" theory was inapplicable to this case because the defendant's first

statement was "non-inculpatory" and because the "pre-Mirandized statement . . . does not impact on the second statement. . . . [I]t is different from the post-Miranda statement and does not qualify as a so-called cat-out-of-the-bag statement."[9]

⁹The Commonwealth argues that the judge was correct in finding that there was no violation of the defendant's rights under the "cat out of the bag" test, and furthermore, that in the absence of such a violation, no "break in the stream of events" was required.

The observations of Justice Harlan, concurring in part and dissenting in part, in *Darwin* v. *Connecticut*, 391 U.S. 346, 350-351 (1968), have been cited widely as authority for the "cat out of the bag" analysis. In *Darwin*, a case not controlled by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), Justice Harlan stated that the prosecution should be required to meet its burden under both tests in order to render a subsequent statement admissible: "[W]hen the prosecution seeks to use a confession uttered after an earlier one not found to be voluntary, it has, in my view, the burden of proving not only that the later confession was not itself the product of improper threats or promises or coercive conditions, but *also* that it was not directly produced by the existence of the earlier confession . . . Here, the facts as stated by the state courts fail to satisfy *this additional burden*." (Emphasis supplied.) *Id.* at 351. See *People* v. *Chapple*, 38 N.Y.2d 112, 114-115 (1975), rejecting the argument made by the State that, because the "cat out of the bag" theory was inapplicable, the confession was consequently admissible, and requiring suppression of a confession where the prosecution failed to demonstrate a break in the stream of events: "Warnings . . . must *precede* the subjection of a defendant to questioning. Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning." (Emphasis in original.)

In circumstances where a suspect is subjected to a continuous custodial interrogation (i.e., there is no break in stream of events) but does not respond with an incriminating statement until after the Miranda warnings have been given (i.e., the cat is not out of the bag), it may be argued that no Fifth Amendment violation has occurred. The exclusionary rule, when utilized to protect Fifth Amendment rights, is directed solely toward police misconduct that produces incriminating testimony as its fruit; by contrast, when it is utilized to effect the Fourth Amendment, "[i]t is directed at all unlawful searches and seizures . . . ." *Brown* v. *Illinois*, 422 U.S. 590, 601 (1975). (No separate Fourth Amendment violation is alleged in this case.) However, because interrogation without benefit of the Miranda warnings is itself improper police conduct, the absence of a break in the stream of events, in some circumstances, may mandate the suppression of a post-Miranda statement, even where the suspect made no incriminating statement during the course of the illegal interrogation. See *Westover* v. *United States*, 384 U.S. 436, 494-497 (1966).

Because the defendant argues, and we agree, that the facts are in his

We regard the judge's finding that the defendant's first statement was not inculpatory as clearly erroneous; if the judge's statement is a conclusion of law, we consider it to be wrong. The defendant's first statement, that he and Duclos were "4 wheeling" in Duclos's truck at the time the killings occurred, put him in Duclos's company at the time of the murders, and clearly amounted to an "incriminating" response. *Commonwealth* v. *Tavares*, 385 Mass. 140, 150, cert. denied, 457 U.S. 1137 (1982). *Commonwealth* v. *Rubio*, *supra* at 513 & n.8. Moreover, in view of what the police had already learned from Duclos, the defendant's statement was particularly incriminating, because Duclos had offered the same alibi just before confessing to the crimes. The first statement, if available to the prosecution, would have constituted strong evidence of consciousness of guilt.

We also disagree with the judge's conclusion that the first statement "does not impact on the second." On this issue, the facts of the present case closely resemble those in *Commonwealth* v. *Haas, supra.*[10] We concluded that the "cat was out of the bag" following the defendant's admission that he had

---

favor under both the relevant tests, the relationship between the two tests is not an issue in this case.

[10]As we noted in *Commonwealth* v. *Watkins*, 375 Mass. 472, 481 (1978), in the *Haas* case, we employed the "cat out of the bag" theory in conjunction with the "break in the stream of events" theory. In *Haas*, we held that where the police are aware that a suspect has incriminated himself, they are required to afford the suspect a break in the interrogation. We follow that rule in this case.

We disagree with the Commonwealth's contention that the facts of this case more closely resemble those in *Commonwealth* v. *Watkins, supra* at 482. In *Watkins*, the defendant, who was being interrogated in Louisville, Kentucky, first made a statement that "detailed in the main his activities in Louisville on the day of his arrest," although he did admit that he had recently been in Boston (where the crime for which he was being interrogated had taken place). We concluded that "[t]he later statements . . . could not be deemed the 'product' of his earlier statement . . . ." *Id.* We consider the statement made by the defendant in this case to have been significantly more inculpatory. Moreover, in *Watkins*, the defendant was afforded a "break in the stream of events" sufficient to insulate the later statement from any prir · illegality. No such break was offered to the defendant in this case.

left his home for work at 6:30 A.M., *id.* at 551, because the police knew from separate forensic evidence that the victims had been killed a few hours before that time. The inculpatory quality of the defendant's statement was established conclusively by other evidence already known to the police — the defendant may have believed, mistakenly, that his statement was exculpatory. Having realized that the suspect had made an incriminating statement without benefit of the Miranda warnings, the police were then obligated not only to administer the warnings, but also to create a break in the stream of events to insulate any later statement from the taint of the prior illegality. Because they did not do so, the defendant's subsequent statement was inadmissible.

Similarly here, the inculpatory quality of the defendant's statement that he was "4 wheeling with Duclos" was established conclusively by the prior knowledge of the police that Duclos had offered a similar alibi just before confessing to the crimes. Because, as in *Haas*, the police did not afford the defendant a break in the stream of events, a similar result is required. Where the police have become aware that the suspect has incriminated himself during a custodial interrogation, and yet, after reciting the warnings, allow the interrogation to continue without affording the defendant a break in the stream of events, the law prior to *Oregon* v. *Elstad*, *supra*, required that subsequent statements be suppressed. Following the analysis in *Commonwealth* v. *Haas*, *supra*, therefore, we conclude that the Commonwealth has failed to meet its burden of dissipating the taint of the illegal interrogation, requiring suppression of the defendant's post-Miranda statement.[11]

We therefore reject the Commonwealth's argument that the case should be decided solely on the principles set forth

---

[11]The defendant's second statement, in which he admitted his knowledge of the plan, his presence at the scene, and his assistance afterward, was sufficient to support a conviction of murder in the first degree on a theory of joint venture. Its admission in evidence at the defendant's trial, therefore, cannot be said to have been harmless. *Commonwealth* v. *Hanger*, 377 Mass. 503, 510-512 (1979).

in *Oregon* v. *Elstad, supra*. The failure to administer the Miranda warnings as presently required by Federal law is itself an improper police tactic, and "any confession obtained in the absence of proper *Miranda* warnings is by definition 'coerced' —regardless of how 'friendly' the actual interrogation," *State* v. *Lavaris, supra* at 857. The defendant in this case was eighteen years of age; he had a poor educational background; he was ten miles from his home and without transportation; he was not informed of his statutory right to use the telephone (see discussion at note 4, *supra*); he made an incriminating statement during a custodial interrogation; then, after receiving the Miranda warnings, he confessed his involvement in the crimes. To allow that statement to be used at his trial would countenance precisely the kind of police interrogation that the presumption of taint was intended to deter.[12]

The wiser course, we believe, is to presume that a statement made following the violation of a suspect's Miranda rights is tainted, and to require the prosecution show more than the belated administration of Miranda warnings in order to dispel that taint.[13] This presumption supports one of the purposes of the "bright-line" Miranda rule: to avoid fact-

[12]See The Supreme Court, 1984 Term — Leading Cases, 99 Harv. L. Rev. 120, 147 (1985) (criticizing *Oregon* v. *Elstad* decision on the ground that it "sacrifices the precision of *Miranda* and promises once again to sink lower courts in a mire of inquiries into voluntariness" and "affords law enforcement officers positive incentives to withhold *Miranda* warnings strategically and thus vitiates the ability of *Miranda*'s bright line test to instill norms of proper conduct in law enforcement agents").

[13]The Court of Appeals of New York, in *People* v. *Bethea*, 67 N.Y.2d 364 (1986), rejected the decision in *Oregon* v. *Elstad*, and required suppression as a matter of State constitutional law. The court reasoned that its State constitutional protection against compelled self-incrimination "would have little deterrent effect if the police know that they can as part of a continuous chain of events question a suspect in custody without warning, provided only they thereafter question him or her again after warnings have been given." *Id.* at 366. But see *State* v. *Elstad*, 78 Or. App. 362, 365, review denied, 302 Or. 36 (1986). After remand from the United States Supreme Court, the State of Oregon declined to apply a standard more strict than the newly-enunciated Federal standard for the admissibility of such statements under its State Constitution.

bound inquiries into the voluntariness of confessions, where police officers are generally more credible witnesses than criminal defendants. It is also consistent with our "humane practice" holding that, "before any statement by a defendant to law enforcement officers or their agents may be placed before the jury, the Commonwealth must prove voluntariness beyond a reasonable doubt." *Commonwealth* v. *Tavares, supra* at 152. See *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). Compare *Lego* v. *Twomey*, 404 U.S. 477, 489 (1972) (standard for voluntariness under the Federal Constitution is by a preponderance of the evidence). Therefore, as a common law rule of evidence, see *Commonwealth* v. *Tucceri, ante* 401, 408-409 (1992), governing the admissibility of confessions and admissions, we shall, in a situation where Federal law requires Miranda protections, continue to follow the principles set forth in *Commonwealth* v. *Haas.*

Because we are requiring the suppression of the defendant's statement on other grounds, we need not consider whether an independent basis for suppression is presented by the defendant's claim that the police intentionally violated G. L. c. 276, § 33A, by failing to inform him on his arrival at the police station of his right to use a telephone.

Two other arguments made by the defendant are relevant to his retrial. The defendant argues that the prosecutor's closing argument, in which he urged the jury to conclude that both Duclos and the defendant committed the crimes, contradicts Duclos's own testimony, in which he contended that the defendant alone shot Duclos's parents. Therefore, the defendant argues on appeal, the prosecutor knowingly presented false evidence in violation of *Napue* v. *Illinois*, 360 U.S. 264 (1959), in conducting his examination of Duclos as a witness for the Commonwealth. This argument is without merit. There is no evidence in the record that Duclos's testimony was false or that the Commonwealth knew it to be so. In making his closing argument, the prosecutor was simply informing the jury that it was unnecessary for them to credit Duclos's testimony completely in order to convict the defendant; this argument was proper.

The defendant was not entitled to a jury instruction on the failure of the police to conduct certain tests. "The decision whether to instruct a jury regarding the inferences that may be drawn from the failure of the police to conduct forensic tests lies within the discretion of the trial judge." *Commonwealth* v. *Cordle, ante* 172, 177 (1992), and cases cited. As in *Commonwealth* v. *Andrews*, 403 Mass. 441, 463 (1988), the defendant here was afforded the opportunity to conduct a thorough cross-examination of the police officers as to any investigative procedure not used. The decision not to give the requested jury instruction was well within the judge's discretion.

The order denying suppression of the defendant's signed statement to the police is reversed and that statement is ordered suppressed. The judgments are reversed, the verdicts set aside, and the case remanded for a new trial.

*So ordered.*

NOLAN, J. (dissenting). The rule of *Oregon* v. *Elstad*, 470 U.S. 298, 314 (1985), should be followed. There, the United States Supreme Court correctly left to the fact finder the only crucial question, whether the suspect made a rational and intelligent choice either to waive or to invoke his rights after Miranda warnings had been given.

I dissent.