COMMONWEALTH *vs.* MICHAEL ANDREW OSACHUK.

Middlesex. March 9, 1994. - July 11, 1994.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Assistance of counsel. *Evidence*, Admissions and confessions. *Practice, Criminal*, Voluntariness of statement, Assistance of counsel.

At a hearing on a motion to suppress evidence in a criminal case, the judge correctly ruled that the defendant's first written statement to police was admissible as voluntarily given in a noncustodial situation and that the defendant's second written statement was to be suppressed as the product of a custodial interrogation before which the defendant had not been read his Miranda warnings; with respect to the defendant's third written statement, which he gave after receiving Miranda warnings, the judge should have allowed the motion to suppress, where the statement was inculpatory and was not shown to be untainted by the illegality of the second statement. [234-237]

INDICTMENT found and returned in the Superior Court Department on June 13, 1991.

A motion to suppress evidence was heard by *Robert H. Bohn*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Wilkins*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*William S. Ahalt* for the defendant.

*David E. Edmonds*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, charged with manslaughter, appeals the partial denial of his motion to suppress three written statements which he made to the Lowell police regarding the death of Lisa Amrheim. After a hearing, a judge of the Superior Court allowed the defendant's motion as to

one of the written statements (chronologically, the second statement) and denied it as to the others. The defendant sought leave to file an interlocutory appeal, Mass. R. Crim. P. 15 (b) (2), 378 Mass. 884 (1979); a single justice of this court referred the matter back to the motion judge for reconsideration in light of *Commonwealth* v. *Smith*, 412 Mass. 823 (1992), just then decided by this court. On reconsideration, the motion judge again denied the motion as to the first and third statements, but allowed it as to the second statement. The defendant renewed his application for leave to take an interlocutory appeal. The application was granted by a single justice, who referred the case to the full bench. We agree with the defendant that his third statement must be suppressed.

We summarize the facts as found by the motion judge. On April 25, 1991, the defendant was visited in the early morning by Matthew Dowd and Lisa Amrheim, a recent acquaintance of Dowd. Throughout the morning the three consumed cocaine and watched videotapes. At around 10 A.M., they drove from the defendant's home in Bolton to the defendant's father's office in Chelmsford. The defendant, who was thirty-eight years old, spent around thirty minutes with his father and obtained some money from him. He, along with Dowd and Amrheim, drove to the apartment of Patricia Jaffe on Highland Street in Lowell. Jaffe, they knew, had access to cocaine and heroin.

That afternoon, at Jaffe's apartment, all four consumed heroin and cocaine, although the defendant did not consume as much as the others. At some point, Amrheim injected herself with a combination of heroin and cocaine, commonly called a "speedball." Shortly after injecting herself, Amrheim began convulsing and lost consciousness. In an effort to revive her, the defendant and Jaffe put Amrheim in a bath of cold water. Amrheim did not appear to respond; the defendant then prepared a mixture of water, salt and cocaine and injected it into Amrheim's arm. He and Jaffe laid Amrheim down on Jaffe's bed, apparently with the expectation that she would sleep off the effects of the speedball. At

approximately 3:30 P.M.., the defendant and Dowd drove to the defendant's home, leaving Amrheim on the bed at Jaffe's apartment. She was unconscious when they left.

Dowd and the defendant returned to Jaffe's at approximately 7 o'clock that evening, intending to pick up Amrheim. They found her still in bed. They attempted to awaken her, to no avail. They then drove her to the emergency room at St. Joseph's Hospital in Lowell. She was pronounced dead on arrival.

Inspector Michael Farnum of the Lowell police department received a call directing him to the hospital at about 7:45 P.M. When he arrived, he went to the emergency room and observed Amrheim's body. The emergency room doctor with whom Farnum conferred would not state the cause of death until he received a toxicology report. Nonetheless, Farnum suspected that she had died of a drug overdose. In the lobby area, Farnum was directed to the defendant and Dowd as the persons who had brought Amrheim to the hospital. He approached the defendant and asked him his name. "Michael" was the defendant's only response. When Farnum asked his last name, the defendant threw a piece of paper to him that bore his full name. Farnum asked the defendant what had happened to Amrheim. The defendant responded that he had found her in a "drug area" of Lowell and driven her to the hospital.[1]

Farnum asked the defendant to accompany him to the police station to file a report. Although he expressed a desire not to be involved, the defendant reluctantly agreed. On the way to the station, Farnum asked the defendant to direct him to the area where he had found Amrheim. The defendant directed him to a location on Spring Street in Lowell.

---

[1] Before arriving at the police station, the defendant made this, and certain other oral statements, to the police. The motion judge found that "any and all statements made prior to the first [written] statement at the police station were non-custodial and voluntary." These findings are well supported by the evidence, and we agree with the judge's conclusions regarding the oral statements.

*The first written statement.* Once at the station, Farnum and the defendant went into an interview room, where Farnum began to fill out a victim-witness statement form. No Miranda warnings were given at this time. The defendant described the circumstances surrounding Amrheim's death as follows: He, Dowd, and Amrheim had gone to Spring Street earlier that evening. The defendant remained in the automobile while Amrheim went into an apartment to purchase heroin and Dowd went into a nearby package store. Dowd returned to the car, and waited with the defendant. When, after about forty-five minutes, Amrheim had not returned, they became concerned and began looking for her. The defendant walked down an alley for approximately one hundred feet and was approached by an Hispanic male who told him a woman was lying on the ground at the end of the alley. The defendant approached the woman, found that she was Amrheim, and went to retrieve the automobile. He drove the automobile into the alley, put Amrheim in, and drove her to the hospital.

After the defendant had dictated this statement to Farnum, he read it and signed it. Throughout the interview, the defendant was lucid and did not appear to be under the influence of any drugs. He told Farnum that he was not under the influence of alcohol, that he had not consumed any drugs for many hours and that he was no longer affected by those drugs.

*The second written statement.* After the defendant signed the first statement, Farnum left the interview room and conferred with a detective (Durkin) who had been interviewing Dowd in an adjacent room. Farnum learned that Dowd had related a significantly different course of events. According to Dowd, the incident had not occurred on Spring Street, but rather in an apartment on Highland Street. In addition, Dowd had informed Durkin that a woman named "Pat" (Jaffe) was also involved.

Farnum returned to the room where the defendant was waiting and confronted him with the inconsistencies between the defendant's and Dowd's accounts of the events. Again, no Miranda warnings were given to the defendant. During this

interview, which was rather hostile, Farnum aggressively shouted at the defendant and called him a liar. The defendant then revised his account of the day. He explained that earlier in the evening, he, Dowd and Amrheim had gone to Jaffe's apartment, where they consumed heroin and cocaine. Amrheim injected herself with a speedball and appeared to lose consciousness. The defendant and Dowd tried to revive her by placing her in a bathtub of cold water. She did not respond. The defendant and Dowd then put her in bed. At approximately 7:30 P.M.., when another attempt to awaken Amrheim failed, they drove her to the hospital.

Farnum typed this statement on the same victim-witness form as the first statement, and the defendant signed it. As Farnum was concluding this interview with the defendant, he received a call from Durkin, who, in the meantime, had gone to Jaffe's apartment. During this call, Farnum was informed that, in an effort to revive Amrheim, the defendant had injected her with a mixture of salt, water and cocaine.

*The third written statement.* Armed with this information, Farnum returned to the interview room where the defendant, by now, had been for nearly two hours. Farnum read the defendant his Miranda rights from a card, and had the defendant sign the card acknowledging that he received and understood the warnings. Farnum told the defendant of his conversation with Durkin, and asked him what had really happened that evening. The defendant then supplemented his earlier version of events with the detail that, in an attempt to revive Amrheim, he had injected her with a solution of salt, water and cocaine.

Farnum recorded this version of events on a form used to record defendants' (as opposed to witnesses') statements. The defendant signed the statement.

*The motion judge's rulings.* The judge held that, until the conclusion of the first written statement, the defendant "was not in custody or deprived of his freedom in a significant way," and therefore, not entitled to Miranda warnings. He found that "the defendant was entirely free to leave" and that "[t]he questioning was informal and nonaggressive."

The judge found "beyond a reasonable doubt that the [first written] statement was voluntary."

By the time Farnum took the second statement, he was aware of some serious inconsistencies between the defendant's and Dowd's versions of events. The judge held that the defendant should have been read his Miranda warnings at this point. The judge found that: "Although Farnum still did not know whether a crime had been committed, he suspected that the defendant knew. The questioning became aggressive and the defendant was confronted with inconsistencies in his story. Farnum used the inconsistencies to leverage a further statement. The defendant had been in the station for almost two hours. There was a good deal of shouting. It is reasonable to conclude that the defendant was not free to leave the police station. Indeed, a reasonable person in this atmosphere . . . would conclude that he was not free to leave . . . ."

The judge denied the motion to suppress as to the third written statement. In his original memorandum, the judge held that the third statement was not tainted by the illegality of the second statement because the second statement was not inculpatory (and thus, did not let the "cat of the bag"). He concluded further that even if the "cat had been let out of the bag," under the principles of *Oregon* v. *Elstad*, 470 U.S. 298 (1985), the third statement did not have to be suppressed.

In *Commonwealth* v. *Smith*, 412 Mass. 823 (1992), which was decided after the judge had ruled, we rejected the principles of *Elstad*. *Smith*, *supra* at 836-837. Because that decision was issued on the day that the parties appeared before a single justice of this court on the defendant's request for leave to file an interlocutory appeal, the single justice denied the request without prejudice so as to give the judge the opportunity to reconsider his ruling in light of *Smith*. Doing so, the judge affirmed his earlier ruling that suppression of the third statement was not required, concluding that *Smith* was factually distinguishable.

*Analysis.* We agree with the judge that the first written statement need not be suppressed. The defendant argues that

the first interview constituted a custodial interrogation. The judge's factual conclusion that the defendant was free to leave up until the time of the second statement is amply supported by the evidence. The judge found that the officers investigating Amrheim's death did not suspect that any crime had been committed or that the defendant may have been a suspect rather than a witness to a sudden, unexplained death. The defendant's first written statement (and his earlier oral ones) were not the product of a custodial interrogation, and Miranda warnings were not required. See *Commonwealth v. Bryant*, 390 Mass. 729, 736-737 (1984).

The difficult question presented by this case is whether the illegality of the second statement tainted the third statement, which the defendant gave after he had received his Miranda warnings.[2]

In this Commonwealth, there is a presumption "that a statement made following the violation of a suspect's Miranda rights is tainted," and the prosecution must "show more than the belated administration of Miranda warnings in order to dispel that taint." *Smith, supra* at 836. This presumption may be overcome by showing that either: (1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag. The Com-

---

[2]The Commonwealth did not seek leave to file an interlocutory appeal from the grant of the defendant's motion to suppress as to the second statement. See Mass. R. Crim. P. 12 (b) (2), 378 Mass. 884 (1979). *Commonwealth v. Lewin (No. 3)*, 408 Mass. 147, 150-151 (1990). In its brief, the Commonwealth argues that, contrary to the judge's conclusion, Miranda warnings were not necessary before the defendant made the second statement because he was not in custody. The Commonwealth argues that, until Farnum heard from Durkin that the defendant had injected Amrheim with a cocaine and saline solution, he was not suspected of any crime. It cites *Commonwealth v. Simpson*, 370 Mass. 119, 125 (1976), for the proposition that Miranda warnings need not be given before the person being questioned becomes a suspect in a crime. The judge's finding that the defendant was in custody at this point was well supported, and that fact distinguishes this case from *Simpson*.

monwealth argues that both theories properly apply to this case. We disagree.

A. *Break in the stream of events.* Although the judge made no finding whether there was a break in the stream of events,[3] we have no difficulty concluding that there was not. See *Smith, supra* at 832. The Commonwealth argues that there was a break in the stream of events when Farnum left the interview room to take Durkin's call, during which Farnum learned that the defendant had injected Amrheim with the cocaine and saline solution. We do not consider this the type of "intervening circumstance" that breaks the stream of events. The third statement was the product of a continuous interrogation; the defendant never left the room and never spoke to anyone other than Inspector Farnum. Cf. *Commonwealth* v. *Watkins*, 375 Mass. 472, 482 (1978) (defendant given opportunity to telephone attorney, instead had lengthy conversation with mother before deciding to give statement). Farnum's brief absence from the room did not insulate the subsequent statement. See *Commonwealth* v. *Haas*, 373 Mass. 545, 548, 554 (1977).

B. *Cat out of the bag.* The judge found that the third statement was not tainted because the second statement did not inculpate the defendant. We conclude that this finding is clearly erroneous. It is true that the defendant's third statement, in which he admitted injecting Amrheim with a cocaine and saline solution, contained the most inculpatory detail of all three statements. However, the second, illegally obtained statement was also incriminating. In it the defendant admitted that he had previously fabricated an account of the evening, which could fairly be construed as consciousness of guilt. See *Smith, supra* at 834. Moreover, the second statement acknowledged that he had spent the day with Amrheim, that he had consumed illegal drugs, and that he had known that Amrheim was unconscious when he put her

---

[3]The judge made no such finding because he concluded that the cat was not out of the bag, and thus, no such showing by the Commonwealth was necessary.

in a tub of cold water. That the defendant may have intended to convey a version of events that ignored the most obviously inculpatory detail does not mean that the earlier details do not incriminate him. Clearly they do. See *Smith, supra* at 834; *Haas, supra* at 554.

This is not a case where the only incriminating information came after the defendant received Miranda warnings, or where the later statement was "substantially different from, and even contradictory to, the original statements." *Commonwealth* v. *Watkins, supra* at 482. The third statement was identical to the illegally obtained second statement, except for the additional detail regarding the injection of the cocaine and saline solution. This addition, though obviously of critical importance, was a product of the second statement, because it simply supplemented an already (though less) incriminating account of events. Contrast *Watkins, supra* at 482 (later statement not product of illegal one where illegal one denied any involvement in incident). As we stated in *Smith, supra* at 836: "The wiser course . . . is to presume that a statement made following the violation of a suspect's Miranda rights is tainted, and to require the prosecution show more than the belated administration of Miranda warnings in order to dispel that taint." No such showing was made here.

The Commonwealth has been unable to overcome the presumption that the third statement was tainted by the illegality of the second statement. Thus, we conclude that the third statement also must be suppressed.[4] The order denying suppression of the defendant's third written statement is reversed and the statement is ordered suppressed. In all other respects, the order is affirmed.

*So ordered.*

---

[4]Given this result we need not reach the question whether the defendant's waiver of his Miranda rights was knowing and voluntary.