Agnes, Peter W., J.
*584 1. Introduction
The defendant, Darres Edmunds, is charged in a seven-count indictment with armed assault with intent to commit murder, multiple counts of assault and battery by means of a dangerous weapon, and firearm violations arising out of a shooting that took place at South Plaza in Worcester on May 10, 2007. The defendant has filed a pretrial motion to suppress evidence in the form of statements he made to the Worcester Police Department following his arrest on May 11, 2007.
2. Findings of fact
Based on the credible evidence presented at the hearing on the defendant’s motion, I make the following findings of fact. Detective Michael Tarckini has been a police officer for 20 years, the last 14 of which he served in the Worcester Police Department. He was appointed to the rank of detective in 2006. Detective William Escobar has been a Worcester Police Officer for 10 years. Both detectives have had extensive experience in conducting interviews of crime victims, witnesses and persons suspected of committing crimes. Neither of them, however, has had any special training in interrogation techniques including the kinds of questions that should or should not be asked. On May 10, 2007, Detective Tarckini became aware of a shooting incident in Worcester in the area of South Plaza. He responded to the scene. He provided assistance to Detective Hinson who was the lead investigator, and in doing so learned that the defendant was a suspect.
3.
On the following day, May 11, 2007, in the evening hours, Detective Tarckini was at the Worcester Police Station when he and his partner, Detective Escobar, were assigned to interrogate the defendant, Darres Edmunds, who had been arrested. Both detectives had reason to believe that the defendant was involved in the shooting the day before. The defendant was in a room inside the Worcester Police Department known as the “back room.” The back room is described as a pre-interrogation waiting area where prisoners such as the defendant and others are first taken before being brought into a separate location known as the interrogation room. The interrogation room is equipped with audio and video recording devices. There is no official Worcester Police Department policy that requires that a prisoner must be questioned initially in the “back room” before a formal, recorded interrogation is conducted, and there is no consistent practice followed by Worcester Police detectives in this regard. When asked to explain the reason why the practice is followed, Detective Tarckini was not able to supply one. Moreover, he acknowledged that it was not a practice that was followed in every case, and sometimes the location of an interrogation simply depended on the number of witnesses or suspects waiting to be interviewed.
4.
Detective Tarckini and his partner met the defendant in the back room. The defendant had not requested to speak with the police, and Detective Tarckini had no idea whether the defendant wanted to cooperate. Rather, the defendant asked the police “Why am I here?” Detective Tarckini told the defendant he was a suspect in the May 10th shooting at South Plaza. The defendant replied, “not me; you’ve got the wrong guy; I was somewhere else.” Detective Tarckini stated that the defendant would be moved to the interrogation room for questioning. The defendant again stated that the police had arrested the wrong person. Detective Tarckini stated that the shooting took place during the daytime in front of “lots of witnesses” and that he was confident “we’ve got the right guy.” Detective Tarckini also told the defendant that videotaping equipment had been installed in the South Plaza area. Although the defendant continued to deny he was the shooter, he did admit he had gone to South Plaza. Detective Escobar said “we’re going into the interrogation room and talk about it.” Detective Tarckini then proceeded to fill out a “witness identification form” which is used for interviews with all witnesses and suspects and includes personal identifiers. See exhibit 1.
5.
It was approximately 9:00 p.m. when the defendant was taken to the interrogation room. The recording system was activated manually with a switch that was located in another room. Detective Tarckini assumed that the other officers who were in that room had activated the switch to begin recording the interview of the defendant. However, the system was not activated. The interview of the defendant commenced off the record and proceeded for about fifteen minutes before someone entered the room to tell Detective Tarckini that the interview was not being recorded. I find this failure to record the interview was inadvertent. Even though the first fifteen minutes of the interview were not recorded, I find that the defendant was informed of his Miranda rights as he was seated without handcuffs at a table in the interrogation room. Also, the police explained that the interview was being audio and video recorded (even though, unknown to them the equipment had not been activated) and pointed out the location of the camera. The defendant acknowledged that he understood his rights and signed and dated a waiver form. See exhibit 2.
6.
The police began the interview with questions about the shooting the day before at South Plaza. The defendant said he had taken the bus to the Plaza with several friends. His friend “Fuzzy” tried unsuccessfully to cash a check at Stop and Shop and eventually was able to cash it by opening up a bank account at Bank of America. The defendant further stated that while waiting on the sidewalk for a ride, a dispute arose *585 between Fuzzy and someone in a vehicle. Fuzzy was attacked. Fuzzy pulled out a gun and fired a round at his attacker. This person, in turn, said he was going back to his car to get his gun and that he was going to shoot the defendant and his two friends. The defendant said he feared for his life so he picked up Fuzzy’s gun (which had fallen to the ground) and fired at the victim once he saw the butt of a gun that the victim was reaching for inside his vehicle. I find that during the unrecorded portion of the interview, the police conducted themselves in a professional manner by remaining calm, by not shouting at the defendant and by not threatening him in any way. The defendant was not impaired by alcohol, drugs or a mental health problem. He understood his Miranda warnings and agreed to answer the questions put by the police. He remained calm throughout the interview. He did not ask for the questioning to cease at any time, and did not request an attorney.
7.
In addition to questions about the shooting at South Plaza, another police officer, Detective Lee Boy-kin, asked to question the defendant about another criminal incident. After waiving his Miranda rights, the defendant was asked questions about this other incident, but the defendant denied any involvement in it. The recorded interview is consistent with the statements made by the defendant during the initial unrecorded interview.
7.
At approximately 9:15 p.im, the interview was interrupted and Detective Tarckini realized the interview had not been recorded. The police went back to the beginning and began the interview again. The recorded interview is in evidence. See exhibit 4.
8.
There also was testimony from the defendant. He is 18 years old and lives in Worcester with his mom, 2 brothers and a sister. He dropped out of school in the 10th grade and has not earned his GED. He reads and writes. He has a 2-year-old son. At the time of his arrest and police interrogation, the defendant worked at a Burger King restaurant. He has had some mental health treatment consisting of a once a week meeting with a counselor. He understands the purpose and meaning of Miranda warnings and agreed to speak to the police on May 11, 2007. I do not credit the defendant’s testimony that the police told him “you’re going down” or words to that effect. I don’t credit the defendant’s testimony that the police told him he would go to jail for 10 years if he did not cooperate, and that the police would not “go after” his family if he agreed to cooperate. Finally, I do not credit the defendant’s testimony that the police said they would intercede with the District Attorney’s Office and tiy to get him released on bail if he cooperated.
9. Rulings of law
A person must be advised of Miranda rights and waive those rights before the police may conduct a “custodial interrogation.” Miranda v. Arizona, 384 U.S. 436, 444 (1966) (custodial interrogation means “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way”). Interrogation for Miranda purposes is defined as “express questioning or its functional equivalent.” Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The term “functional equivalent” includes any words or actions on the part of the police that the police should know are “reasonably likely to elicit an incriminating response from the suspect.” Commonwealth v. Rubio, 27 Mass.App.Ct. 506, 512 (1989), quoting Rhode Island v. Innis, supra at 301. “[An] ‘incriminating response’ . . . [is] any response-whether inculpa-tory or exculpatory-that the prosecution may seek to introduce at trial." Rhode Island v. Innis, 446 U.S. at 301 n.5 (emphasis in original). It makes no difference that the police have a legitimate, subjective motive that is unrelated to obtaining an incriminating response (such as to explain how the interrogation procedure will be conducted) because the ultimate test is objective, i.e., how did the person in custody perceive the questions or statements by the police. See Commonwealth v. Torres, 424 Mass. 792, 796-97 (1997).
10.
“The Supreme Court has emphasized that, in order to determine whether a suspect has been subjected to custodial interrogation, the primary focus is on the suspect’s perceptions rather than the police officer’s intent.” Commonwealth v. Sheriff, 419 Mass. 186, 198 (1997) (citations omitted). However, “the intent of the police is not entirely irrelevant, particularly where the challenged police practice is designed to elicit an incriminating response from the accused, because it bears on whether the police should have known their words or actions were reasonably likely to have that effect.” Sheriff, supra, 419 Mass. at 199, quoting Rhode Island v. Innis, supra at 301 n.7. For example, in Commonwealth v. Barros, 56 Mass.App.Ct. 675 (2002), prior to giving any Miranda warnings, the police asked the defendant if he owned a paintball gun. The police knew that evidence of paintball use had been found at the crime scene. The question was thus designed to elicit an incriminating response. The question led directly to the defendant showing the officers to his room. The evidence discovered as a result of this violation was directly caused by the custodial interrogation and must be suppressed."
11.
It is clear that when the defendant asked the police why he had been brought to the backroom and the police replied that he was a suspect in the shooting that had occurred the day before, their words constituted custodial interrogation, le., words or actions on *586 the part of the police that the police should know are “reasonably likely to elicit an incriminating response from the suspect.” Commonwealth v. Rubio, 27 Mass.App.Ct. 506, 512 (1989), quoting Rhode Island v. Innis, supra at 301. Contrast, Commonwealth v. Mitchell, 47 Mass.App.Ct. 178 (1999) (officer’s statement to defendant in custody that it was too bad he was locked up so close to the holidays was an “observation” not a question because it was not specifically directed at the defendant, and would have been interpreted by a reasonable person in this situation as a mere comment upon the defendant’s unfortunate circumstances, not calling for any response).
If the initial statement by the police was not custodial interrogation, then certainly when the defendant said they had identified the wrong person, the next reply by the police — to the effect that the crime took place in front of witnesses and we have the right person — was custodial interrogation. And, these statements did, in fact, elicit an incriminating response because while the defendant denied any role as the shooter, he did admit that he was at the scene of the crime.[1] Contrast, Commonwealth v. Nom, 426 Mass. 152, 156 (1997) (“His initial statement did not place him at the scene of the crime, nor did it link him with the victim close to the time of the shooting”).
12.
As a result of the violation of the Miranda doctrine, any and all statements made by the defendant during his interview with the Worcester Police in the back room and prior to the administration of his Miranda rights must be suppressed. There is no evidence in the record before me that the police have a videotape of the crime. See note 1 supra. Even assuming that this statement was false, there is no other evidence of coercion on the part of the police. There is no evidence of any violence or threat of violence. There is no evidence that the defendant was under the influence of alcohol or drugs, impaired by any mental health problems, by a lack of sleep or by any physical disability or distress. The initial interview was conducted in a calm atmosphere. Even though he was a high school dropout, my review of the videotaped portion of the interview satisfies me that the defendant exhibited self-control, was able to understand the questions put to him and made a free and voluntary choice to speak. I therefore find by a standard of proof beyond a reasonable doubt that the defendant’s statements made during the initial interview in the back room were voluntary.
13.
The question, therefore, becomes whether the exclusionary rule operates to bar not only the statements by the defendant during the initial interview, but his later unrecorded and recorded statements made after he received Miranda warnings. In Commonwealth v. Smith, 412 Mass. 823, 829 (1992), the Supreme Judicial Court explained that it would not follow the rule announced in Oregon v. Elstad, 470 U.S. 298, 314 (1985), where the United States Supreme Court held that the taint resulting from a voluntary statement obtained in violation of Miranda is ordinarily removed by the subsequent administration of Miranda warnings. Commonwealth v. Martin, 444 Mass. 213, 222 (2005) (“In concluding that Federal law was no longer adequate to protect rights guaranteed by art. 12, we announced our intention to continue the previously prevailing rule, adopting it as a common-law rule of evidence”). Instead, the Supreme Judicial Court formulated a bright-line rule whereby a defendant’s second statement that is made voluntarily and after a waiver of Miranda rights will nonetheless be suppressed if it follows a first statement obtained in violation of Miranda unless there is a “break in the stream of events” that is sufficient to insulate the subsequent statements from the effect of the earlier statements or it can be said with confidence that the earlier statements had not been inculpatory such that “the cat was out of the bag.” Commonwealth v. Smith, 412 Mass. at 830, 831.
14.
In this regard, the present case closely resembles Commonwealth v. Haas, 373 Mass. 545 (1977), a case discussed by the Court in Commonwealth v. Smith, in which this two-part analytical approach was followed with the result that the defendant’s statements were suppressed. In Haas, the defendant was questioned about his wife’s death in circumstances in which he should have but did not receive Miranda warnings. After making an admission -with respect to the time he left his home on the day of his wife’s death, he was advised of his Miranda rights and proceeded to make further statements. Even though the subsequent statements were voluntary, the Supreme Judicial Court held that they must be suppressed because they were made close in time to the defendant’s earlier statements and those earlier, unwarned statement had let the cat out of the bag. Haas, 373 Mass. at 554. Just as in Commonwealth v. Smith, 412 Mass. at 832, the statements made by the defendant in this case after the administration of Miranda warnings were “the result of a single continuous interrogation,” and were affected by his earlier admission that he was present at the scene of the crime. Accord, Commonwealth v. Daimano, 422 Mass. 10, 13 (1996). Contrast, Commonwealth v. Prater, 420 Mass. 569, 582 (1995) (Court accepts trial court’s subsidiary findings that there was a break in the stream of events between the two statements). If during the initial unwarned interview, the defendant had simply told the police that they made a mistake and he had no involvement in the shooting, it is possible that the intervention of Miranda warnings could save his subsequent statements from suppression.[2] However, to hold that the administration of Miranda warnings during the second interview cured the failure to give them prior to the first interview would be tantamount to applying the rule of Oregon v. Elstad in disregard of the directions by the Supreme Judicial Court.
*587 15. Conclusion
There is a presumption that a statement made following a Miranda violation is tainted. Commonwealth v. Smith, 412 Mass. at 836. The Commonwealth has failed to meet its burden of establishing that the taint of the initial illegal interrogation was dissipated prior to the defendant’s subsequent, post-Mirandarecorded and unrecorded statements for the same reasons identified by the Supreme Judicial Court in Commonwealth v. Smith, 3412 Mass. at 835. “[A]ny confession obtained in the absence of proper Miranda warnings is by definition ‘coerced’ — regardless of how ‘friendly’ the actual interrogation.” Id, at 836, quoting State v. Lavares, 99 Wash.2d 851, 857 (1983).
ORDER
For the above reasons, the statements made by the defendant to the Worcester Police on May 11, 2007 while he was in the back room and while he was in the interrogation room are hereby suppressed.

 In addition, the further statement by the police to the effect that there was videotaping equipment installed in the area of the crime scene (implying that the police had access to a videotape of the defendant committing the crime), was clearly calculated to obtain an incriminating response without observing the requisites of the Miranda doctrine.

 In Commonwealth v. Smith, 412 Mass. at 833 n.9, the Court left open the question whether incriminating statements by a person who is subjected to custodial interrogation in violation of Miranda and who makes voluntary, but non-inculpatory, statements and is then advised of his Miranda rights and goes on to make the incriminating statements would be admissible even though there is no break in the stream of events. In such a case, suppression should still be required as a prophylactic remedy for what is clearly improper police conduct, especially in a case like this in which the police made no effort to determine whether the defendant wanted to make a statement, offered no justification whatsoever for the failure to inform the defendant of his Miranda warnings before they questioned him in the back room, and then told him that they would be going into the interrogation room for a further conversation. Contrast, Commonwealth v. Larkin, 429 Mass. 437-38 (1999).